# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF IDAHO

|  |  |  |
|---|---|---|
| IN RE | ) | |
| | ) | **Case No. 08-12687-CSS** |
| **DBSI INC.**, *et al.*, | ) | |
| | ) | **Chapter 11** |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| **JAMES R. ZAZZALI, as Litigation** | ) | |
| **Trustee for the DBSI Estate** | ) | |
| **Litigation Trust,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Adv. No. 12-06056-TLM** |
| | ) | |
| **MARTY GOLDSMITH and JOHN** | ) | |
| **DOE 1-10,** | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MEMORANDUM OF DECISION
_____

## INTRODUCTION

James R. Zazzali ("Plaintiff") is the trustee for the jointly-administered

estates of DBSI, Inc., an Idaho corporation ("DBSI"), and certain DBSI affiliated

debtors and consolidated non-debtors.  Plaintiff is also the litigation trustee for the

DBSI Estate Litigation Trust formed under a confirmed chapter 11 plan, and

charged *inter alia* with pursuing transfer avoidance actions.

MEMORANDUM OF DECISION - 1

In November 2010, Plaintiff filed the complaint commencing this action against Marty Goldsmith ("Defendant").[1]  Plaintiff seeks to avoid certain transfers under § 548(a)(1) and (2), and under Idaho state law made applicable under § 544(b), and to obtain recovery under § 550.[2]  This adversary proceeding was filed in the District of Delaware and venue was subsequently transferred to this Court in October 2012.

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (2)(H) and (O) in which this Court enters final orders and judgment.[3]

This Decision constitutes the Court's findings of fact and conclusions of law.  Fed. R. Bankr. P. 7052.[4]

**FACTS**

### A.    Overview

The Delaware Bankruptcy Court substantively consolidated numerous

---

[1]  The operative complaint is the First Amended Complaint ("FAC"), Doc. No. 1-17.

[2]  Unless otherwise indicated, all statutory references are to the Bankruptcy Code, Title 11 U.S. Code §§ 101–1532.

[3]  The FAC and Defendant's Answer were filed in 2012, prior to the amendment of Rules 7008 and 7012(b).  Both parties have consented to this Court's entering final orders and judgments subject only to appeal.  *See* Doc. No. 28; *see also Zazzali v. Goldsmith (In re DBSI, Inc.)*, 2013 WL 1498365, *1–2 (Bankr. D. Idaho Apr. 11, 2013)

[4]  Over the course of Phase I and Phase II of the trial, 301 exhibits were admitted and 22 people testified.  The Court has considered all the evidence presented, and the contentions of the parties, even if not specifically discussed in this Decision.  As to all witness testimony (other than that admitted through deposition *de bene esse*), the Court has evaluated the credibility of the witness.  It has also determined the weight to be given each witness's testimony.

MEMORANDUM OF DECISION - 2

DBSI debtor and non-debtor entities after finding, among other things, that they operated as a single economic enterprise with largely overlapping officers, directors, members, and general partners.[5]  The primary and parent entity at bankruptcy was DBSI, Inc., the successor as of 2008 to DBSI Housing Inc.  Doug Swenson was the majority owner and principal executive of DBSI and its predecessor.

As the Delaware court also found, "DBSI and its related entities were involved in three main spheres of business activity: the syndication and sale to investors of tenant-in-common interests in real estate, the purchase of real estate, and investments in technology companies."  *Zazzali v. Mott (In re DBSI, Inc.)*, 447 B.R. 243, 245 (Bankr. D. Del. 2011).[6]  That court also rendered, in connection with confirmation, findings and conclusions including "that 'DBSI ran its business and entities as a unified enterprise under common ownership and control' with a 'small group of insiders [who] employed that control to raise cash, commingle it,

---

[5]  *See generally* Ex. 315 (confirmation order).  The "DBSI Consolidated Debtors" were collectively DBSI, Inc.; DBSI Asset Management LLC; DBSI Development Services LLC; DBSI Discovery Real Estate Services LLC; DBSI Land Development LLC; DBSI Properties Inc.; DBSI Realty Inc.; DBSI Securities Corporation; DBSI/Western Technologies, LLC; DCJ, Inc.; FOR 1031 LLC; Spectrus Real Estate Inc.; and the "Consolidated Non-Debtors" included DBSI Redemption Reserve Fund, an Idaho general partnership; DBSI Investments Limited Partnership; Stellar Technologies, LLC; and all the "Non-Debtor Affiliates" described on Schedule 1 to the Disclosure Statement.  The "Note/Fund Consolidated Debtors" included "Plan Debtors" such as DBSI 2006 Notes and DBSI 2006 LOF.  *Id.* at 60–61, 95–96, 98, 101, 108–109.  (The Court in this Decision refers to exhibit pagination rather than the original document's pagination).

[6]  The "tenant-in-common" interest has been referred to as "TIC."  The term was used by counsel and witnesses throughout this trial as a noun, adjective and verb.

MEMORANDUM OF DECISION - 3

and then distribute it as needs presented.'" *Id.* (quoting confirmation order); *see also* Ex. 315 at 14.

The parties are in general agreement with the Delaware court, and others, that DBSI and its many related entities, under the control of Doug Swenson, his sons Jeremy and David Swenson, Gary Bringhurst and Mark Ellison, were engaged in a massive Ponzi scheme.  As Defendant's closing brief concedes:

> In this case, there is substantial evidence, which Goldsmith does not dispute, that beginning in 2005, certain entities within the DBSI group were operating with the characteristics of a Ponzi scheme . . . . [T]he operation of the Ponzi centered on three investment units sold by DBSI as either securities through security markets or as interests in real estate through real estate markets: (1) promissory notes, both secured and unsecured; (b) [*sic*] bonds, usually secured; and (3) TICs or tenant in common units.  The largest of the three was the TIC investment unit, with DBSI entities selling a whopping $1.2 billion in TIC units in one year.  The problem was not in the sale of the TIC units, it was what was done with the proceeds of later TIC sales that created the Ponzi.

> The Ponzi scheme on the notes, bonds and TICs of DBSI occurred when later investment units were created and sold to new investors ostensibly to raising [*sic*] new funds to investment [*sic*] in legitimate real estate investments.  Instead, the new funds raised would be used to repay or redeem earlier investors at what had become unsupported rates of return that had been promised.

Doc. No. 353 at 13.[7]

---

[7]  Defendant however resisted Plaintiff's attempts to establish through pretrial motion the existence of a Ponzi scheme and, based thereon, the application of the "Ponzi presumption" (which is discussed further below).  While Defendant now acknowledges these Ponzi aspects and scheme, after a substantial evidentiary presentation by Plaintiff, he still raises several defenses to the FAC, including his asserted lack of knowledge of the Ponzi scheme at the time of the subject transaction.

B.    The adversary proceeding

The transaction underlying this litigation was the purchase of certain Idaho real estate from Defendant.  As this Court noted in a prior decision, Plaintiff asserts that Defendant received around $29 million in exchange for selling approximately 180 acres of real property located in Ada County, Idaho (the "Property" or, at times, the "Tanana Valley Property") that was worth substantially less.  *Zazzali v. Goldsmith (In re DBSI Inc.)*, 2013 WL 1498365, * 1 (Bankr. D. Idaho Apr. 11, 2013).[8]  Plaintiff contends DBSI was in desperate need of additional real property to "TIC out" to investors in order to keep the Ponzi alive, and was willing to pay more than fair market value for this property in order to obtain it for such purpose.  *Id.* at *6–7.

The Court strongly encouraged a mediation process in this litigation, which ultimately was unsuccessful.[9]  Thereafter, the Court, with the concurrence of the parties, scheduled the trial in two phases.  Phase I, tried on September 11–14, 2017, dealt with the value of the Tanana Valley Property.  That phase was resolved through entry of oral findings of fact and conclusions of law on November 8, 2017, which are incorporated fully by reference, and here generally summarized.

_____

[8]  The details of, and the specific entities involved in, the transaction will be addressed later in this Decision.

[9]  *See*, *e.g.*, Doc. Nos. 157–58, 171–74.

MEMORANDUM OF DECISION - 5

## 1.     Phase I and the valuation ruling

The Property was mostly undeveloped ground located at the southeast corner of Meridian Road and Victory Road in Meridian, Ada County, Idaho.  On October 21, 2005, the owners of the Property (the Caven L.O.M. Trust and the Caven Foundation) sold the Property to Justin Martin or his assigns for $19,200,000.  Martin, who is Defendant's half-brother, conveyed the Property to Defendant by deed executed that same day, though the deed was later recorded in June 2006.  Between the execution and the recording of this deed, Defendant entered into a Purchase and Sale Agreement ("PSA") on April 17, 2006 with Kastera, LLC ("Kastera") as the purchaser.  Ex. 101.[10]  Under the PSA, Defendant contracted to sell the Property—which he had acquired just six months earlier for $19,200,000—for a total price of $35,804,500.  This amount was to be paid through earnest money of $3,400,000 in the form of a note from Kastera, guaranteed by Kastera's owners, Doug Swenson and Thomas Var Reeve, with a due date of September 10, 2006, and the balance of $32,404,500 was to be paid at closing, scheduled in October 2006.  *Id.*; *see also* Ex. 103 (note), Exs. 108, 109 (guarantees).

The Property was in a "rural urban transition" zone, and Defendant—a local real estate developer—had already applied for annexation into the city of

---

[10]  The PSA was executed by Doug Swenson as manager of Kastera.

MEMORANDUM OF DECISION - 6

Meridian and for preliminary plat approval for a residential subdivision.  The PSA

required Defendant to obtain, before closing and at his cost, "acceptable

entitlements" (*i.e.*, actual annexation and preliminary plat approval).  In August of

2006, Defendant achieved annexation.  However, that same month, Reeve had

discussions with Defendant about Kastera's inability to meet the earnest money

deadline, or to close as scheduled.  *See*, *e.g.*, Ex. 204.[11]

By an agreement reached in September 2006, and based on a payment of

$500,000 to Defendant, the maturity date of the earnest money note was extended

one month to October 10, 2006.  Ex. 105.  On that new due date, a check in the

amount of $2,980,258.54 was paid by Kastera, LLC to Defendant.  Ex. 110.  As

addressed in the Phase I decision, this amount represented the balance owed on the

earnest money note after adjusting for the prior partial payment and accrued

interest.

A September 13, 2006 "second amendment" to the PSA set a January 27,

2007 closing date.  Ex. 106 at 2.[12]  But as that date approached, a January 22, 2007

letter from Reeve advised Defendant that Kastera would not close at the

$35,804,500 figure but, instead, offered to purchase the Property for a total of

---

[11]  Exhibit 204 is Defendant's August 14, 2006 memorandum to file regarding his August 8 meeting with Reeve and Kastera's attorney Tom Morris, and his August 9 meeting with Reeve. This memo is discussed later in greater detail.

[12]  This amendment added a small strip of land as well, and addressed other matters.

MEMORANDUM OF DECISION - 7

$24,000,000 inclusive of the earnest money.  Ex. 133.[13]  Following negotiations, a February 19, 2007 "third amendment" to the PSA established that the balance of the purchase price to be paid at closing (*i.e.*, in addition to the earnest money paid in October 2006) would be $25,400,000.  It also provided that the January 2007 closing would be extended to February 26, 2007.  Ex. 140.

The transaction closed on that day, and the final price paid for the Tanana Valley Property under the terms of the third amended PSA, comprised of earnest money of $3,400,000 and a final payment of $25,400,000, was $28,800,000.[14]

The Court, in its November 17, 2017 Phase I decision, found that the value of the Property, as of February 26, 2007, was $25,480,000.[15]

### 2.    Phase II

All other issues were reserved for Phase II.  Trial was held on February 26–28 and March 1–2, 2018.  The matter was taken under advisement upon the submission of closing briefs on March 16, 2018.

---

[13]  This letter referenced $3,500,000 as earnest money paid and proposed $20,500,000 of "new money."  *Id.*

[14]  The parties have generally and fairly consistently discussed the transaction with reference to these amounts.  That made it easier to follow the sense and thrust of their arguments.  However, the precise amounts of the payments as the transaction occurred were somewhat different.  Additional details regarding the transaction and amounts will be discussed later in this Decision.

[15]  This would appear to indicate that the difference between price paid ($28,800,000) and value of the Property ($25,480,000) is $3,320,000.  However Plaintiff contends that even if Defendant is entitled to a good faith defense, he is still liable for $2,920,000.  *See, e.g.*, Doc. No. 308 (Plaintiff's trial brief) at 1, 22, 24.  This will also be addressed further.

MEMORANDUM OF DECISION - 8

C.    **DBSI's TIC business and operations**

The testimony of multiple witnesses and hundreds of documents

established how DBSI and its numerous subsidiaries, closely-owned and other

related entities, operated.

In confirming the Second Amended Joint Chapter 11 Plan for the DBSI

entities, the Delaware court in October 2010 summarized:

> 25.  Prior to the Petition Date, the DBSI enterprise was separated into
> three main spheres of activity:
> (a) the syndication and sale to investors of TIC interests in real
> estate ("TIC Investment").  Offering documentation reflects that the
> marketability of those interests rested on (i) their qualification under
> Internal Revenue Code § 1031 as a tax-minimization device for
> sheltering capital gains in commercial real estate, and (ii) guarantees
> given by DBSI of a steady return on investments;
> (b) the purchase of real estate at various stages of development
> for ultimate sale to the TIC Investors; and
> (c) investment in the Technology Companies.
>
> 26.  Underlying these various business activities were a number of
> fund-raising entities.  These issued debt instruments such as notes and
> bonds, or offered participation shares in limited liability companies
> through private placement offerings to qualified investors (collectively
> the "Note/Bond/Fund Entities").  Investors in the Note/Bond/Fund
> Entities provided capital for the other three areas of the DBSI
> enterprise (the "Note/Bond/Fund Investments").

Ex. 315 at 13–14.

The structure of DBSI's TIC operation involved the acquisition by a DBSI

entity of real property, often an income producing property (*e.g.*, a retail shopping

center, office park or building).  Investors willing to purchase a fractional interest

in the property were then solicited.  Simultaneously, a DBSI entity (as a "master

lessee") entered into a "master lease" with the TIC investors in/owners of the property. This master lessee leased the property from the TIC investors and then subleased it to commercial tenants; collected rent from those tenants; paid the operating expenses of the property; and paid the debt service to the lender who financed acquisition of the property, which lender was typically secured by a mortgage on that property. The TIC owners were assured a fixed monthly payment reflecting a return on their investment. The evidence indicated that the agreements with TIC investors obligated the DBSI master lessee to ensure the property was leased to sublessees, that tenant improvements were made, and that the property's expenses were paid.[16] DBSI promoted the financial strength of this structure by touting DBSI's real estate experience and its professional management of the acquired properties being leased.

### 1.    McKinlay and Bringhurst testimony

Matthew McKinlay was a former accounting manager at DBSI and reported to Matt Duckett, DBSI's vice president of finance and accounting. McKinlay's testimony demonstrated significant and detailed knowledge of the business records and operations of all DBSI entities, having worked with the books and accounting

---

[16] Matthew McKinlay (discussed below) testified that a portion of the TIC investments would be designated as "accountable reserves" for these purposes and was typically 5% of the investment. Gary Bringhurst (also discussed below) indicated that such reserves were amounts "up to" 10% of the purchase price paid by TIC investors. Both said that, under the TIC agreements, the accountable reserves were to be used only for tenant and capital improvements, leasing commissions, and the like.

MEMORANDUM OF DECISION - 10

records on a daily basis and being the current custodian of DBSI records.[17]

McKinlay explained that DBSI Housing (later DBSI, Inc.) was the controlling parent entity for hundreds of other entities, and how it created and managed a business process that utilized DBSI-controlled subsidiaries and related entities to acquire real estate for sale to investors who would buy the fractional (TIC) ownership interests.  The sale of these TIC interests occurred through a "real estate channel" under a DBSI entity, FOR 1031, LLC ("FOR 1031"), which sold those interests through real estate brokers.  TIC interests were also sold through a "securities channel" under DBSI Securities Corp. ("DBSI Securities").[18]

McKinlay was involved in the DBSI chapter 11 plan as it was developed, and was involved in the administration of the confirmed plan.  He validated the accuracy of the finding that, *inter alia*, supported substantive consolidation of all the debtors' estates as one estate:

> 27.  DBSI ran its businesses and entities as a unified enterprise under common ownership and control.  A small group of insiders employed that control to raise cash, commingle it, and then distribute it as needs presented, without regard for source or restrictions on use. The practice of running DBSI as a unified enterprise caused investors to rely upon the purported financial strength and competence of the unified enterprise in deciding to invest in various DBSI projects.  The Chapter 11 Trustee's factual investigation revealed transactions of fantastic and tortured complexity.  These inter-entity transactions cannot practically be unraveled.  Based upon the proofs submitted by

---

[17]  McKinlay is employed pursuant to a consulting agreement with the Plaintiff, and he is compensated as a 1099 contractor, including compensation for time spent testifying.

[18]  *See* Ex. 1256 (chart of DBSI Group's business structure, including "TIC Businesses").

MEMORANDUM OF DECISION - 11

the Plan Proponents, the Court finds that it is impossible to truly trace and separate cash obtained from the Note/Bond/Fund Entities and cash obtained from TIC Investments, just as it is impossible to separate cash used to pay Note/Bond/Fund Entities' obligations from cash used to pay TIC Investment obligations. Moreover, a great many transfers of cash and properties between DBSI entities were either constructively or actually fraudulent or otherwise gave rise to claims between the DBSI entities. Any attempt to trace all the different transfers and litigate the competing rights and claims among the DBSI entities would involve years of contentious litigation and, ultimately, administratively bankrupt most if not all of the Debtors' estates.

Ex. 315 at 14–15.

McKinlay described DBSI as being the "mothership" to which all subsidiaries reported, and that Doug Swenson at all times held the majority ownership in DBSI. McKinlay testified that Doug Swenson controlled the ultimate decisions on all DBSI matters—including the final decisions in "cash management meetings," which determined where and how available funds would be used on a global DBSI basis.

McKinlay had a team of employees that fielded TIC investor calls and handled investor relations. Among other things, they received many questions about the use of the accountable reserves for purposes other than the limited ones required or allowed under the agreements. But, in fact, while a portion of TIC investments had been "booked" as accountable reserves, that cash was never actually segregated. This component of the TIC investors' payments was used by

MEMORANDUM OF DECISION - 12

DBSI wherever it was needed.[19]  By the time of bankruptcy, it was fully

exhausted.[20]

McKinlay also explained that DBSI had a notes and bond business which

raised funds that could be used to buy real estate.  DBSI was the sole owner of

DBSI 2005 Secured Notes Corporation ("DBSI 2005 Notes"), DBSI 2006 Secured

Notes Corporation ("DBSI 2006 Notes"), and DBSI 2006 Land Opportunity Fund

LLC ("DBSI 2006 LOF").[21]  As noted in the confirmation ruling by the Delaware

court, the TIC investments and the note/bond investments were structured

differently.  The TIC investors had an interest in real property (albeit fractional)

and the note and bond fund investors had a payment obligation from a DBSI entity

that may have held debt or equity interests in other DBSI real estate entities.  Ex.

---

[19]  Ex. 1042 is a chart, created by McKinlay, of the acquisition and disposition of accountable reserves during 2006.  It reflects $42.9 million of accountable reserves raised, but only $4.1 million used as required (*e.g.*, leasing commissions, capital expenditures, tenant improvements).  The remaining $38.8 million was spent on general DBSI operations including payroll, overhead, and payments to TIC investors.  Ex. 1043 is a similar chart for 2007.  That year, $62.3 million of accountable reserves was raised, with $7.3 million spent as required and $55 million spent on general DBSI operations.

[20]  Ex. 1197 reflects that as of September 2008, a total of $89.7 million of accountable reserves had been raised, $16.1 million used as required, and $73.6 million spent otherwise, leaving nothing for investors.

[21]  The private placement memorandum ("PPM") for DBSI 2006 Notes in October 2006 offered $50 million of 8.41% secured notes due December 2014, and indicated the proceeds from sale of the notes would provide funds to DBSI and subsidiary entities controlled by DBSI to acquire, develop and/or finance real estate prior to their sale, resale, third-party financing or syndication.  Ex. 180 at 1.  The PPM for DBSI 2006 LOF in April 2006 offered investors the opportunity to purchase up to $25 million worth of units (membership interests) in that company which was formed to acquire and develop undeveloped land.  It indicated the investment objectives of DBSI 2006 LOF were to "preserve and protect" the members' capital, provide cash distributions to members from the sale of projects, and provide return of members' capital upon termination and wind-up of the company in four years.  Ex. 179 at 1.

MEMORANDUM OF DECISION - 13

315 at 18.

Gary Bringhurst joined FOR 1031 in 2003.  In 2005, DBSI Discovery Real Estate Services ("DDRS") was formed as a joint venture between FOR 1031 and DBSI Securities to handle their operational issues.  Bringhurst became the president and CEO of DDRS in 2005.

Bringhurst explained that cash management meetings were held at DBSI starting toward the end of 2005.  These meetings were attended by Doug Swenson, Jeremy and David Swenson,[22] Reeve as president of Kastera,[23] Bringhurst, and DBSI's controller Paris Cole.  The meetings dealt with cash availability and needs on a "global" DBSI basis, and a "cash sheet" would show the real estate that needed to be bought or sold, funding requirements for operations, and similar data.[24]  The ultimate decisions as to the use of cash were made by Doug Swenson.

The frequency of the cash meetings accelerated from monthly to weekly as

---

[22]  Bringhurst stated that David Swenson dealt with the note and bond side of the DBSI business and Jeremy Swenson the real estate side.

[23]  Kastera was created in mid-2005, just after DDRS was formed, primarily to purchase land with development potential.  McKinlay testified that DBSI used the majority of the money raised by DBSI 2006 Notes and DBSI 2005 Notes for Kastera projects.

[24]  *See*, *e.g.*, Exs. 392, 393.  The Delaware court found that both the examiner's report and due diligence by the chapter 11 trustee and creditors committee "revealed that cash arising from both [TIC and Note/Bond/Fund] investments was extensively commingled among the Plan Debtors and Non-Debtor Affiliates, and properties were routinely bounced back and forth between TIC Investment and Note/Bond/Fund Investment structures, often in conjunction with gross manipulations of value by DBSI management[.]"  Ex. 315 at 18.

MEMORANDUM OF DECISION - 14

cash needs increased but its availability tightened.  The cash situation became increasingly problematic from early 2006 on.  Cash was needed to obtain additional property for the TIC program, make the ongoing required payments to existing TIC investors, meet the operational needs of the existing TIC properties, and fund Stellar Technologies, Inc. ("Stellar"), the holding company for DBSI's significant investments in technology companies.[25]

Additionally, in July 2007, the SEC issued a notice that TICs were securities that could be sold only through licensed broker dealers, with appropriate PPM.  As a result, FOR 1031 ceased selling TICs, but TICs were still being sold in the securities channel via DBSI Securities.

In summary, DBSI's income came from TIC sales, and also from sales of

---

[25]  DBSI invested heavily in numerous technology companies.  Bringhurst testified that these companies never made a profit or generated cash that could be used in other DBSI endeavors.  However, Doug Swenson decided how to use funds and continued to invest in such companies notwithstanding the feelings of Bringhurst and others that this jeopardized the whole DBSI operation.  By mid-2008, over $235 million had been invested in the tech companies.  Ex. 381 at 2 (investment notes in non-real estate entities).  *See also* Ex. 1236 (summary of negative net worth of technology companies, 2003–2007).

The Delaware court's confirmation decision found that Stellar "holds ownership interests in and was a conduit for providing capital and financing to certain technology related entities" but it "had no revenue-generating business operations, and no assets other than interests in" the technology entities.  Further "[a]ll of Stellar's equity interests [in those companies] were pledged to secure inter-entity loans.  The pledgees, Stellar's creditors, were all affiliated entities, however, and the money those affiliates loaned to Stellar all originated from commingled pools of funds received from DBSI investors.  Neither DBSI Investments nor Stellar ever had the means to repay these 'loans'[] . . . .  With respect to commingling of funds between the Consolidated Non-Debtors and DBSI, DBSI-related entities made loans totaling $208,333,387 to the Technology Companies[]."  The Court further observed that the funds needed for such investments "were always transferred from whatever DBSI-related account had sufficient funds[]" and that "[i]n large part, the funds came from Accountable Reserves."  Ex. 315 at 23.

MEMORANDUM OF DECISION - 15

bond and note interests.[26]  DBSI also satisfied its incessant need for cash by using

the accountable reserves that had been created in prior TIC sales, but it did so

contrary to the contractual restrictions on use of such reserves.

As noted, the TIC investors were entitled to ongoing payments.  According

to Bringhurst, the ability to pay those investors was contingent on DBSI obtaining

new TIC properties and soliciting new investors but that was never disclosed to

either the old or new investors.

Bringhurst also described the monthly "asset management meetings"

attended by Doug Swenson, Bringhurst, Duckett, Brian Olsen (the COO of

DDRS), and DDRS's Michael Attiani (responsible for master lease portfolio

management on the property side) and Steve Winger (similar responsibility from

the leasing side), both of whom reported to Olsen.  These meetings established

that DBSI's master lease portfolio, managed by DDRS, was hemorrhaging money.

While investors had received some information as to portfolio or asset

performance, that ceased around the end of 2005 when the portfolio as a whole

ceased to perform profitably.[27]  The December 2005 asset management report

showed a year-end cash flow loss of $8.7 million.  Ex. 329 at 3.[28]  The December

---

[26]  As addressed by McKinlay in his testimony, Ex. 1256 shows that note and bond offerings were completed through DBSI 2005 Notes, DBSI 2006 Notes and DBSI 2006 LOF.

[27]  Bringhurst testified that not all individual properties in the portfolio were cash flowing negatively, though the portfolio as a whole was.

[28]  The report noted that a "significant amount [of that loss] is attributable to DBSI's policy to charge the properties 6% Management Fees.  The internal portion of that management

(continued...)

MEMORANDUM OF DECISION - 16

2006 report showed the year-end loss had doubled to $16.6 million.  Ex. 336 at 3.

And the December 2007 report showed the loss had doubled again, to $38 million.

Ex. 333 at 2.[29]

   Bringhurst acknowledged that, throughout this period, investors were

given a misleading picture of DBSI's financial health.  However, notwithstanding

that misleading information, investors were becoming increasingly concerned.

One such investor, Bil Marvel, wrote to Doug Swenson in March 2007,

explaining that he owned TIC interests in fifteen properties and, according to 2006

year end statements, only two made money in that year, and that the total dollar

loss on the other thirteen properties was $4.37 million in 2006.[30]  Ex. 1033.  He

also noted that three of these properties had negative NOI (net operating income).

He raised serious concerns over the losses, downhill performance, and absence of

any communications from DBSI.  *Id.*  DDRS's March 8, 2007 response to Marvel,

Ex. 1034, blamed poor performance on a loss of major tenants and reduced cash

flow until the properties were re-leased.  It also asserted that the properties in

---

[28] (...continued)
fee (at least 3% of gross income) accounts for nearly $5MM."  *Id.* at 3.

[29]  The 2007 loss of $38 million was $6.5 million over that year's *budgeted* operating
loss of $31.5 million.  *Id.*  McKinlay testified as to several Master Lease Cash Flow Summaries,
Exs. 1055–1059.  These showed cash flow losses in 2004 (of $4.8 million), in 2005 (of $9.1
million versus a forecasted gain of $8.3 million), in 2006 (of $24.8 million versus a forecasted
loss of $19.1 million), and in 2007 (of $43.7 million versus a forecasted loss of $32.3 million).
*Id.*  In September 2008, DBSI stopped making TIC payments to investors.  Ex. 1060 at 12.

[30]  DBSI was particularly concerned about Marvel because he had created a blog where
TIC investors compared reports regarding their properties.  DBSI discussed internally the investor
concern and Marvel's blog, given their potential impact on continued TIC sales.

MEMORANDUM OF DECISION - 17

which Marvel had invested "were among the worst performing properties" in the

portfolio during 2006 and the "overall operating cash flow during 2006 of all the

properties in [the] portfolio was appreciably better than the overall operating cash

flow of [Marvel's] properties alone." *Id.* Bringhurst testified that this letter was

neither honest nor accurate.[31] As was mentioned above, the *forcasted* operating

cash flow loss for 2006 was $19.1 million, but that projection was exceeded by an

additional $5.7 million.

On February 26, 2013, Bringhurst entered into a plea agreement, Ex. 317,

pleading guilty to the charge of conspiracy to commit securities fraud in violation

of 18 U.S.C. § 371 and 15 U.S.C. §§ 77q and 77x. He agreed to cooperate in the

United States' criminal prosecution of Doug Swenson, David Swenson, Jeremy

Swenson, and DBSI's general counsel Mark Ellison, and he testified at their trial

held before the United States District Court for the District of Idaho.[32] Bringhurst

explained that he had chosen this course because, upon reflection, he realized the

investors not only wanted but were entitled to truthful information, they did not

get it, and he had an opportunity to do something about it, but did not. Bringhurst

also testified as to the accuracy of the "factual basis" recited in the plea agreement

that both he and the government agreed would be proven beyond a reasonable

---

[31] This copy of the DDRS letter is unsigned, and shows Doug Swenson as being copied. However, Bringhurst testified that it was Swenson's response to Marvel's letter.

[32] *United States v. Swenson, et al.*, Case No. 13-cr-00091-BLW (the "Idaho Criminal Case").

MEMORANDUM OF DECISION - 18

doubt at trial.  *Id.* at 4–9.[33]

The Court found McKinlay and Bringhurst to be knowledgeable witnesses; their testimony was detailed and credible and is entitled to significant weight.

### D.    Miller's investigation and report

Gil Miller is well qualified as an expert.[34]  He testified at length with regard to his investigation of the financial condition and transactions of DBSI and its affiliated limited partnerships, corporations and other business entities.

Miller found that the DBSI businesses and enterprise operated as one economic unit under the common ownership and control of a small number of individuals led by Doug Swenson.  The "DBSI Group" consisted of hundreds of entities under the control of Swenson and these insiders.[35]  These individuals made decisions on a global basis, as demonstrated by, among other things, the weekly

---

[33]  The Court incorporates the same by reference without setting it out in full in this Decision.

[34]  Miller has significant training and experience as a Certified Public Accountant, a Certified Fraud Examiner, a Certified Insolvency and Restructuring Advisor, and has conducted numerous insolvency and related analyses.  Miller's qualifications as an expert were not challenged at trial by Defendant.  However, Defendant did file a pre-Phase II motion in limine as to the relevancy of Miller's testimony and the reliability of his methodology.  Doc. No. 273.  That motion was denied, as Defendant's arguments could be addressed on cross-examination.  *See* Doc. No. 292.  In part, the Court's ruling, *id.* at 7–8, considered and followed the approach of the District Court for the District of Idaho in *Zazzali v. Eide Bailly LLP*, Case No. 12-cv-349-MJP at Doc. No. 283-5, which rejected a similar motion in limine directed at Miller and stated that "an expert may opine on either the existence of a Ponzi scheme or the characteristics the DBSI Companies shared with a Ponzi scheme with regard to avoidance counts."

[35]  Miller noted that, in identifying the DBSI Group, he relied significantly on hundreds of tax returns of DBSI entities.  Those returns included balance sheets and financial information, and his reliance thereon was based on the fact that these returns were filed under penalty of perjury and thus had undergone the most scrutiny.  *See* Ex. 360 (DBSI Group tax return index).  He also noted that DBSI self-referred to the "DBSI Group of Companies" in PPM and financial statements.

MEMORANDUM OF DECISION - 19

cash meetings assessing the cash needs of the entities collectively and allocating funds without regard to the source of the cash or restrictions on its use.

Miller addressed the DBSI Group's insolvency on a consolidated basis. He explained that this was not only how DBSI operated, but that accounting rules require such an approach when over 50% of an entity was owned by another.[36] He concluded the DBSI Group was insolvent on a balance sheet basis from December 31, 2004 (a negative $77 million) through December 31, 2008 (a negative $296 million). Ex. 362; *see also* Exs. 363–367. He concluded there was no evidence of solvency at any time between those dates.[37]

Miller also concluded, consistent with the testimony of Bringhurst and McKinlay, that the decisions of Doug Swenson to invest heavily and continually in the technology companies was a material factor in the insolvency.

Miller testified that as early as January 2005 DBSI became dependent upon new investor money.[38] He concluded DBSI was operating as a Ponzi scheme—a type of financial fraud where new investor money is required and used to pay old

---

[36] He testified that an entity-by-entity insolvency analysis could be performed but, given how the DBSI businesses operated, it would essentially be meaningless.

[37] Miller also found that the DBSI Group was equitably insolvent, in that it could not pay debt as it came due without the infusion and use of new investor money and the misuse of accountable reserves.

[38] *See*, *e.g.*, Ex. 378 at 1 (showing cash flow losses of $4.7 million in 2004 rose steadily to $160 million in 2008).

MEMORANDUM OF DECISION - 20

investors—since at least January 1, 2005.[39]  He identified the specific

characteristics of a Ponzi scheme, and he found them all present in DBSI's

operations.[40]

Miller explained there were three primary factors that led to DBSI's

dependence on new investor money and its misuse of old investor money

including the accountable reserves: (1) the sale of $1.2 billion of TIC interests in

2004 and significant continued TIC sales thereafter, which increased the DBSI

Group's master lease obligations, debt service obligations, and TIC investor

payments; (2) the ongoing misuse of investor funds to make continual and

significant investments in technology companies that generated no income or

profit; and (3) the existence of obligations to real estate limited partnership

investors dating back to the 1990's.

Miller's conclusions were solidly based, capably defended, and persuasive.

His testimony on both direct and cross-examination was precise.  His mastery of

the huge amount of financial material and documentation was evident.  His

---

[39]  Miller determined the TIC master lease liabilities to the investors was $785 million in
2004.  He found that the income from the TIC properties was not sufficient to fund the required
payments.  This resulted in constant pursuit of new TIC properties and TIC investors.  Those
liabilities rose to $1.86 billion by October 2008.  Ex. 351.

[40]  They include a dependence on infusion of new outside funds; prior investor money
not used for its stated purpose; new investor money used to pay old investors; a lack of business
profits sufficient to pay as promised; commingling of finances and funds; lack of corporate
formalities; misstated financials; material misstatements to investors; and lack of audited or
complete financials.

MEMORANDUM OF DECISION - 21

testimony is entitled to, and is accorded, significant weight.[41]

### E.    The Idaho Criminal Case

A superceding indictment was entered on May 17, 2013, in the Idaho

Criminal Case against Douglas Swenson, David and Jeremy Swenson, and DBSI

counsel Mark Ellison.  Ex. 1001.  Following trial, a jury verdict was rendered on

April 14, 2014, finding each of these defendants guilty on multiple counts.  Ex.

318.  Judgments were entered of record on August 24, 2014, reflecting the Court's

imposition of judgment on August 20, 2014.  *See* Exs. 319A (Douglas Swenson);

319B (Mark Ellison); 319C (Jeremy Swenson); 319D (David Swenson).[42]  The

Ninth Circuit Court of Appeals affirmed the convictions of each defendant for

securities fraud, and of Doug Swenson for wire fraud.  Ex. 1009 (unpublished

decision of Aug. 15, 2017).

### F.    Kastera

Kastera was formed in 2005, and owned by Doug Swenson (67%) and Var

Reeve (33%).[43]  It was capitalized at $6,000,000.  Swenson and DBSI's general

counsel, Ellison, advised Reeve that, in order to solve a separate tax consequence

facing Reeve, Swenson had decided to "loan" Reeve $2,000,000 which Reeve was

---

[41]  Miller's conclusions are consistent with those of the Delaware court in confirming the DBSI liquidation plan.  *See* Ex. 315 at 16.

[42]  *See also* Ex. 1008 (transcript of sentencing hearing).

[43]  Reeve had worked for Western Electronics and thereafter with DBSI starting in 2002. Reeve and Doug Swenson formed FOR 1031, and Reeve became FOR 1031's president and continued in that role until the spring of 2005 when, as noted earlier, DDRS was formed as a "joint venture" between DBSI Securities and FOR 1031.

then to use to pay for his 1/3 interest in Kastera.[44]  The funds were never received

or held by Reeve, and the capitalization was accomplished solely by documents

and book entries.[45]

Kastera, according to Bringhurst, had employees, office facilities, a bank

account, payroll, and filed tax returns.[46]  Kastera was envisioned, at least by

Reeve, as being a company that would acquire real estate for development.  It built

25 homes in 2005 and was exceeding that rate in 2006.  Kastera was not a DBSI

debtor or consolidated non-debtor in the chapter 11.[47]  Miller also noted that

Kastera's initial capitalization was not in cash but rather by book entries

characterizing FOR 1031's funding of Kastera as a "distribution" to Swenson.

Kastera obtained from DBSI entities the funds it needed to acquire

properties.  McKinlay indicated Kastera was never a cash source but was instead a

cash destination and obtained its cash from DBSI sources.  For example, he

---

[44]  This approach bothered Reeve because he thought his anticipated interest in Kastera would be based on "sweat equity."  He felt, however, that he did not have much choice but to accept this proposal.

[45]  Swenson instructed FOR 1031 to pay $6,000,000 to Kastera on his behalf and to treat that as a distribution to him.  Swenson separately obtained a promissory note from Reeve for the $2,000,000 loan, and Reeve's minority ownership interest in Kastera was pledged as collateral for his new note obligation to Swenson. Ex. 189.

[46]  However, McKinlay testified Kastera's payroll was at times funded by other DBSI entities.

[47]  While the parties agree Kastera was not a joint debtor, consolidated debtor, nor consolidated non-debtor, under the confirmed plan the chapter 11 trustee was authorized to, immediately prior to the effective date of the plan, assume the operating agreement of Kastera, remove all its managers and officers, and cause its dissolution. Ex. 315, Ex. B at 182–83.  This authority presumably stems from Swenson's March 1, 2007 assignment to DBSI of his interest in Kastera. Ex. 184.

testified that DBSI bonds and notes were sources for the capital Kastera required to buy real estate, and that Kastera was responsible for over 72% of the total borrowing in 2007 from DBSI 2006 Notes.  *See* Ex. 1258.[48]  Reeve testified that Kastera did not use non-DBSI third-party financing for its acquisitions.[49]  And the evidence established that Swenson personally exercised significant control over Kastera and its decisions.[50]  As an example, Reeve recounted that Kastera had acquired a parcel of property for $3.5 million and immediately received offers to sell it for between $5 and $9 million.  While Reeve thought Kastera should sell it and realize that profit, Doug Swenson did not, and Swenson's decision controlled.[51]

In his testimony Reeve acknowledged that Kastera in 2006 and 2007 could not have self-financed its proposed purchase of the Tanana Valley Property, and that the funds necessary to accomplish that purchase (like other Kastera purchases) would have to come from DBSI.  Bringhurst testified that he did not recall any

---

[48]  McKinlay also testified that, in addition to the funds Kastera received from DBSI 2006 Notes and DBSI 2005 Notes, there were "regular" cash advances from FOR 1031 to Kastera in the October 2006–February 2007 time frame.

[49]  When asked whether third-party lenders could have financed the Tanana Valley transaction in 2007, Reeve answered that Kastera had a relationship with Zions Bank but not for transactions of that size.

[50]  Even though Kastera was controlled by Swenson and most of its debt was to DBSI entities, it was not one of the entities filing bankruptcy.  McKinlay observed, however, that it was Doug Swenson who ultimately determined which of the entities would file as debtors.

[51]  As yet another example of Swenson's control, Reeve noted that Kastera's 2005 and 2006 home building was profitable, but that Swenson would create "warranty reserves" in order to reduce the reportable income from those projects.

MEMORANDUM OF DECISION - 24

source of funding for Kastera acquisitions other than DBSI, and that Reeve had to attend the cash meetings to seek such funds. Kastera was capitalized through, and was dependent for its operational financing upon, DBSI.

Reeve envisioned Kastera as a development and home building company that acquired property for those purposes, and not as a vehicle for acquiring properties that would be used for sale to TIC investors. However, Kastera properties financed by DBSI or DBSI entities were TIC'd out, and Reeve indicated Doug Swenson "called those shots." Swenson made the decisions as to which properties would be used in the TIC portfolio and which ones Kastera could develop with DBSI financing.[52]

Tom Morris was general counsel for Kastera from August 2005 to November 2008. Though he reported to Reeve, he had significant interaction with DBSI and its general counsel, Ellison. Morris, like Reeve, described Kastera's "vision" as becoming the primary home builder in the Boise and Meridian area. He became involved with DBSI because of the close relationship between it and Kastera, including Doug Swenson's majority ownership of Kastera. According to Morris, Kastera would identify a property or project it wanted to develop, and would obtain the money it needed to purchase that property from a DBSI entity.[53]

---

[52]   Wade Thomas, hired as a "compliance officer" at DBSI, served on a "loan committee" for DBSI 2006 Notes which, as noted, provided most of Kastera's financing. He indicated, however, that the loan committee was effectively a "rubber stamp" for Swenson's decisions.

[53]   While stating that Kastera was "autonomous," Morris also explained that it used DBSI
(continued...)

MEMORANDUM OF DECISION - 25

Morris said Kastera would enter into purchase agreements without having arranged financing, but only if Swenson had "green-lighted" the deal. He noted that Swenson also did not like "flipping" parcels acquired by Kastera, even if they could be quickly turned for profit. As Morris stated, "all decisions went through Doug."[54]

### G.    The Tanana Valley transaction

The underlying PSA for the Tanana Valley Property was between Kastera as the purchaser and Defendant as the seller. The PSA required a short term $3,400,000 earnest money promissory note by Kastera, guaranteed by its owners Doug Swenson and Reeve, with the balance of the funds due at closing. Ex. 103 (note); Exs. 108, 109 (guarantees).[55]

After Reeve advised Defendant that Kastera could not meet the deadlines required under the PSA, an "extension payment" of $500,000 was made on the earnest money note, and an extended date of October 10, 2006, was set for

---

[53] (...continued)
funding to acquire properties. In fact, one condition of DBSI funding was that loans would only be made to a DBSI entity, and Kastera therefore formed one for use in processing the loans. Exhibit 360, the listing of DBSI Group tax returns created by Miller, does reflect a "DBSI Kastera Homes LLC" entity. *Id.* at 7, 10.

[54] There was a "restructuring" of Kastera in March 2007 into a home building component and a "development" component. This occurred, according to Morris, "because Doug Swenson wanted to do it" but he testified that he did not necessarily understand what Swenson intended. It appears that the "Kastera Development" entity facilitated acquiring and using property in the TIC program while leaving Kastera Home in the building business. Morris noted that Swenson sent out a "notice" about this reorganization during the time that TIC-ing Kastera's properties was first being mentioned.

[55] McKinlay testified that Kastera could not have internally funded this earnest money obligation.

MEMORANDUM OF DECISION - 26

payment of the balance of the earnest money. Ex. 105 (second amendment to

PSA).[56] On October 10, 2006, Defendant was paid $2,980,258.54 as the balance

of the earnest money owed. Ex. 110.[57]

The $2,980,258.54 payment to Defendant was made by a Kastera check.

Ex. 110. The funds required for this payment were obtained by Kastera from

DBSI 2006 LOF. Exs. 111–113 (reflecting $3,000,000 transferred by DBSI 2006

LOF by wire to DBSI Housing then by wire to Kastera which issued the check to

Defendant).[58]

The balance of the purchase price under the amended PSA, after the

satisfaction of the earnest money note, was $25,400,000. Ex. 140 (third

amendment to PSA) at 1. Just prior to and in connection with the closing on

February 26, 2007, Kastera transferred all its interests under the PSA to DBSI

---

[56]  This agreement provided that "The Extension Payment shall be applied first to interest accrued from April 17, 2006 through September 11, 2006, with the balance applied to principal on the Earnest Money Note." *Id.* The $500,000 was paid by a Kastera check. Ex. 507.

[57]  Exhibit 509 reflects the calculations on the Earnest Money Note given the extension granted and the $500,000 payment. Interest on the note from April 17, 2006, to September 11, 2006, was $68,465.75. The obligation on September 11, 2006, was thus $3,468,465.75 and the $500,000 extension payment reduced the note balance to $2,968,465.75 as of September 11. Interest on that adjusted amount from September 11 to October 10, 2006, was $11,792.54, resulting in a balance due as of October 10, 2006, of $2,980,258.29. The payment actually made was $2,980,258.54. *Id.* The reason for the $0.25 difference is not clear.

[58]  DBSI 2006 LOF also received in October 2006 from Kastera an "option" to purchase 25 acres of the Property. Ex. 107. This was in consideration of DBSI 2006 LOF providing the $3,000,000 to Kastera to satisfy the earnest money note. *See* Exs. 112, 113. If the option were not timely exercised by February 28, 2007, Kastera was obligated to return the money advanced by DBSI 2006 LOF plus interest. Ex. 107 at 2. Morris indicated that this option was the "brainchild" of Doug Swenson to justify Kastera borrowing from DBSI 2006 LOF the $3,000,000 needed for the earnest money obligation.

MEMORANDUM OF DECISION - 27

Tanana Valley LLC ("DBSI-TV"), an entity which had been formed four days

earlier to take title to the Property.[59]

Exhibit 155, the purchaser's closing statement, reflects a "contract sales

price" of $28,800,000 (a figure comprised of an earnest money credit of

$3,400,000 and closing amount of $25,400,000).  This statement also showed a

"new loan" to the purchaser, DBSI-TV, in the amount of $26,350,000, in order to

fund the transaction.  *Id.*; *see also* Ex. 146 (promissory note of DBSI-TV to DBSI

2006 Notes for $26,350,000).  A mortgage was recorded the day of the closing

under which DBSI-TV secured that obligation to DBSI 2006 Notes with the

Property.  Ex. 148.  Morris indicated the $26,350,000 figure represented 85% of a

$31,000,000 appraisal[60] and reflected an attempt to borrow the maximum amount

possible.

The $26,350,000 borrowed was transferred by DBSI 2006 Notes through

DBSI Redemption Reserve ("DRR")[61] and then went by wire transfer to the title

company, Title One, for disbursement to Defendant or third parties on his behalf.

---

[59]  The DBSI-TV operating agreement, Ex. 190, reflects it was formed "[t]o acquire, own, operate, and sell the real estate project known as Tanana Valley[.]"  *Id.* at 4.  The sole member of DBSI-TV was DBSI Housing.  *Id.* at 8.  And while DBSI-TV was a DBSI controlled entity, it was not a DBSI Consolidated Debtor, a Consolidated Non-Debtor, or a Note/Fund Consolidated Debtor.  *See* Ex. 315.

[60]  *See* Ex. 144 (appraisal by Timothy Williams).  This appraisal was never admitted into evidence nor was its valuation substantiated.  Indeed, the Court found the value of the Property in Phase I to be $25,480,000 as of closing.

[61]  According to McKinlay, DRR was an "internal bank" which had wiring capabilities (unlike some of the other DBSI entities), and was used by DBSI to facilitate money transfers.

MEMORANDUM OF DECISION - 28

Exs. 111, 114, 155.  Internally, DBSI treated the funding as a loan from DBSI 2006 Notes to DBSI-TV, secured by the Property, and with that loan guaranteed by DBSI.  Exs. 145–155.

Defendant's approved closing statement reflected that from the $28,800,000 contract purchase price, he was credited with having received the $3,400,000 earnest money.  He also, from the funds that were provided to the title company, (1) had $14,202,232.87 applied to pay off his underlying mortgage to the benefit of Washington Federal; (2) had his closing expenses of $40,977.08 satisfied; and (3) was paid a balance of $11,156,790.05.  These distributions at closing to or for the benefit of Defendant totaled $25,400,000.  Ex. 208.[62]

As mentioned earlier, in asserting an avoidable transfer, Plaintiff contends Defendant should be liable for all the funds he received in the transaction or, alternatively, at least liable for the "$2.92 million differential between the final purchase price for Tanana Valley and its fair market value."  *See* Doc. No. 354 at 56; *see also* Doc. No. 308 (brief) at 1 (arguing Defendant received from DBSI

---

[62]   Recall, the loan DBSI-TV obtained from DBSI 2006 Notes was $26,350,000.  The distributions at closing to Defendant totaled $25,400,000.  The difference, when factoring credits for prorated property taxes and irrigation fees in addition to buyer's closing costs, was $953,510.58. As the process moved toward closing, Morris suggested that this part of the money borrowed by DBSI-TV from DBSI 2006 Notes be used "to reimburse a portion of the $3,500,000 of earnest money paid – the $500,000 paid by Kastera, and $453,510 of the $3,000,000 paid by DBSI." Ex. 1267 at 234; *see also* Ex. 934.  DBSI's counsel, Ellison, replied that Swenson believed that this $953,510 should be used to repay part of the DBSI 2006 LOF loan, not Kastera, and that if Kastera needed funds, it should arrange a separate loan.  Ex. 934.  The closing followed Swenson's instruction.  *See* Ex. 154 (DBSI internal "file balance sheet"), Ex. 155 (purchaser's closing statement), reflecting payment to DBSI 2006 LOF of $953,510.58 out of the $26,350,000 borrowed from DBSI 2006 Notes.

MEMORANDUM OF DECISION - 29

sources a total of $28,400,000 (*i.e.*, $ 25,400,000 at closing, and $3,000,000 in

satisfaction of the Earnest Money Note[63]), and in return transferred the Property

worth $25,480,000—the Court's value determination in Phase I—thus resulting in

a $2,920,000 difference).

Notwithstanding these positional statements, the details of the transaction

indicate Defendant received $2,980,258.54 in the earnest money transfer (with

Kastera retaining the other $19,741.46 of the $3,000,000 that was borrowed from

DBSI 2006 LOF). In the closing, Defendant received amounts totaling

$25,400,000. Of the total funds of $26,350,000 provided by DBSI 2006 Notes,

$953,510.58 remained, which was applied toward the repayment of DBSI 2006

LOF's loan of the funds needed to satisfy the earnest money. *See supra* note 62.

The approach taken by counsel for both parties to simplify the nature of the

transfers and their discussions about the amount of Defendant's potential liability

was perfectly understandable. However, in the context of determining that

liability, precision is important. From the evidence and the foregoing summary,

the Court determines that the amounts originating from the two DBSI entities and

transferred to or to the benefit of Defendant consist of $2,980,258.54 in October

2006 and $25,400,000 in February 2007. These total $28,380,258.54. The value

---

[63]    In its prior decision, *Zazzali v. Goldsmith (In re DBSI, Inc.)*, 2013 WL 1498365
(Apr. 11, 2013), this Court noted how Plaintiff characterized the avoidable recoveries.  Plaintiff
claimed the $3,000,000 funded by DBSI 2006 LOF for use in satisfying the earnest money
obligation is avoidable.  *See id.* at *6 and at n.14 (noting that while the FAC appears to seek the
entire $3.4 million, Plaintiff's counsel at oral argument clarified that it seeks to recover only the
$3 million transferred by DBSI 2006 LOF).

MEMORANDUM OF DECISION - 30

of the Property at the time of transfer in February 2007 as found by the Court in

Phase I was $25,480,000.  The difference (or "delta" as counsel often referred to

it) is $2,900,258.54.

### H.    Post-closing TIC sales

The transaction with Defendant closed on February 26, 2007.  Six months

later, DBSI commenced selling TIC interests in the Tanana Valley Property with

the first of the "Cavanaugh" PPM offerings.  Ex. 400 (Cavanaugh PPM dated

September 26, 2007).[64]  This reflected DBSI's intended and actualized use of the

Property, now titled in DBSI-TV.  Morris indicated that Kastera, though

developing the Property as a Kastera "project," did not agree with using the

Property for TIC investments.  He stated "we didn't like it, but it wasn't our call."

### I.    Additional evidence related to Defendant's knowledge

Defendant's original plan for the Tanana Valley Property was to get the

entitlements and develop it, not to sell it.  But Martin had learned that Kastera was

interested in buying property in the area and relayed that information to

Defendant, who was already generally aware of Kastera as being a "large" home

builder in the area.  Defendant knew Kastera had constructed 20 to 30 homes,

including a large "parade" home.  He was aware that Kastera was looking for

---

[64]  This was followed, in chronological order, by three other PPMs: Ex. 403 (Cavanaugh
IV dated October 17, 2007), Ex. 401 (Cavanaugh II dated Oct. 31, 2007), and Ex. 402
(Cavanaugh III dated February 12, 2008).

development ground as well as building lots and was buying a lot of property.[65]

Defendant said he had "little to no" knowledge of DBSI, but became aware by the time of the PSA that Kastera could get money or financing from DBSI. However he had no exposure to either Reeve or Swenson until just prior to negotiating the PSA.

The use of an earnest money note, with Reeve and Swenson as guarantors, had initially raised some concern, but Defendant said he "got over it."  He could see that aspect as being a reasonable part of an agreement structure which included his own need to obtain preliminary entitlements.  Defendant also did "some work" in his office, including a limited internet search of Swenson which suggested to him that Swenson "was worth some money."  He therefore accepted the earnest money note, and the personal guarantees of that note, as a component of the deal.

Defendant's real estate attorney, Brian McColl, drafted the initial PSA, note, and guarantees.  He explained that the guarantees were an important aspect of the transaction, because the earnest money was in the form of a note, not cash, and the note had to be paid in September.  However, as he testified, the guarantees were by individuals "who I had every reason to believe had significant wealth."

Defendant's August 14, 2006 memo to file, Ex. 204, notes that he met with

---

[65]  Reeve testified that Kastera built 25-30 houses in 2005 with about $50,000 profit per house, and doubled that performance in 2006.  However, there were not enough lots to buy, so he said Kastera got into the development business to acquire the necessary ground.

MEMORANDUM OF DECISION - 32

Reeve and Tom Morris[66] "of Kastera Homes and DBSI" on August 8 and at that

time learned that the PSA's earnest money and closing deadlines could not be met.

Defendant was told there were issues related to Kastera's obtaining the necessary

financing.  Defendant noted in this memo that he was told the "Bond was not out

and there was a SEC restriction."[67]

On September 11, 2006, one day after the earnest money note was due,

Defendant, McColl and Martin met with Doug Swenson, Reeve and Morris.  The

testimony of Defendant, Reeve, McColl and Morris, corroborated by Morris'

notes,[68] reflect that Kastera's principals, Swenson and Reeve, requested an

extension on the payment of the balance of the note then due, and also an

extension of closing under the PSA until the end of January 2007.

As McColl explained at trial, he and Defendant were told at that meeting,

by Swenson, that the funding to be used for Kastera's purchase of the Property

was being obtained through a bond, and they were assured the bond would be

issued in a couple of weeks.  However, they were told that, after such issuance, a

---

[66]  The memo refers to him as "Morrison."

[67]  The memo states:

We further talked about Var's spot re; the SCC [*sic*] restriction could go to a audit
stage and not be good, basically shut stuff down completely.
NASD agencies
Review of proposed subscriptions - no more subscriptions - no private placement
Reg D offerings
goes to a due diligence period.

*See* Ex. 204.

[68]  *See* Ex. 960; Ex. 1267 at 3.

MEMORANDUM OF DECISION - 33

cooling-off period would follow, and then the broker-dealers would do their due diligence and follow that with actual sales which would generate the funds needed to close.

Defendant agreed to extend the due date on the note for 30 days (to October 10) in return for an immediate payment of $500,000 and Swenson's assurance he would honor the note and pay the $3.4 million earnest money even if the transaction did not ultimately close. In addition to the note extension, the parties also agreed to extend the closing date to January 27, 2007.[69] As a component of these accommodations, Defendant was allowed to take back-up offers in the interim.

On September 12, 2006, the $500,000 was paid.[70] In McColl's view, meeting with Kastera's principals face to face, receiving $500,000 cash for the extension, and having control of the documentation, ameliorated his normal concerns when buyers want to buy more time on a transaction.[71] The $2,980,258.54 balance due on the earnest money note was thereafter paid by a Kastera check on October 10 as required. Ex. 110. There was no evidence Defendant knew the source of the money Kastera used to pay for the extension

---

[69] *See* Exs. 105 (note extension) and 106 (second amendment to PSA).

[70] Ex. 507 ($500,000 check from Kastera).

[71] McColl also indicated that in his experience home building and development companies were often "land rich and cash poor" and that this was a factor in considering Kastera's inability to fully fund the earnest money by its original due date.

MEMORANDUM OF DECISION - 34

even though he generally knew Kastera was relying on financing from DBSI in order to fund the transaction. McColl testified that knowledge of DBSI 2006 LOF's involvement only came during litigation.

Defendant said that later in October, Kastera started "making noises" about potentially not being able to close as scheduled. He viewed this as an attempt to "soften him up" for an additional modification. McColl then wrote a November 8 letter to Morris warning that a failure to close would result in Defendant's pursuit of all remedies and damages.[72] He also noted that, at the time the extension of closing to January 27, 2007, was being negotiated, Defendant had made it clear he needed to close the sale by the end of January because the proceeds were required in order to meet a closing date for his purchase of other real property. Thus, McColl argued, the damages would be significant. However, McColl did not discourage Kastera's communication of an alternative proposal which it had mentioned previously.[73]

Following further negotiations between counsel,[74] the agreement was reached on February 19 under which, in addition to the already paid earnest money, $25,400,000 would be paid to Defendant on February 26 to close.[75]

On the closing date, McColl learned that title would be taken by DBSI-TV,

---

[72] Ex. 918.

[73] *Id.*

[74] *See*, *e.g.*, Ex. 138.

[75] Ex. 140 (the third amendment to the PSA).

MEMORANDUM OF DECISION - 35

not Kastera.[76]  This required the form of the deed he had drafted to be changed.

However, McColl explained, the taking of title in a special purpose entity was not

unusual, and simply required him to perform his due diligence to ensure the entity

had been properly created and its organizational documents properly filed.

McColl also learned, as the transaction closed, that DBSI-TV's funding of the

closing amount was obtained through financing from DBSI 2006 Notes under a

promissory note/mortgage structure.  However, McColl and Defendant both

testified that how the buyer put together its financing and could afford to close

was not significant.  None of this, in McColl's or Defendant's view, raised any

particular concerns.

    The transaction closed as described earlier.

**DISCUSSION AND DISPOSITION**

    **A.    Overview**

    Plaintiff's action focuses on what it has characterized as the "Earnest

Money Transfer" and the "Closing Transfer."  The former consists of the DBSI

2006 LOF transfer of $3 million by wire to DBSI, a wire transfer of the same by

DBSI to Kastera, and a transfer via check by Kastera of $2,980,258.54 to

Defendant, all on October 10, 2006, which satisfied the balance then due on the

earnest money note.  The latter consists of the DBSI 2006 Notes' intrabank

---

[76]  Defendant also testified that he learned of the new buyer entity that morning via an email.

MEMORANDUM OF DECISION - 36

transfer of $26,350,000 to DRR, and a wire transfer of the same amount by DRR

to Title One Corp. on DBSI-TV's behalf and for application at closing, and Title

One Corp.'s payment to Defendant of $25,400,000 on February 26, 2007,

satisfying the obligations due at closing.  Plaintiff contends the total of these two

transfers to or to the benefit of Defendant is an amount greater than the

$25,480,000 value of the Tanana Valley Property as found in Phase I.  Plaintiff

seeks recovery of the total $28.4 million transferred[77] or, alternatively, recovery of

what it has consistently referred to as the $2.92 million difference or "delta."[78]

### B.    The causes of action

#### 1.    Actual fraud

Section 548(a)(1)(A) provides, in relevant part:

> The trustee may avoid any transfer . . . of an interest of the debtor in
> property, or any obligation . . . incurred by the debtor, that was made
> or incurred on or within 2 years before the date of the filing of the
> petition date, if the debtor voluntarily or involuntarily—(A) made such
> transfer or incurred such obligation with actual intent to hinder, delay,
> or defraud any entity to which the debtor was or became, on or after the
> date that such transfer was made or such obligation was incurred,
> indebted[.]

Plaintiff, as the Litigation Trustee for the DBSI Litigation Trust, exercises the

avoiding powers of a trustee.  Plaintiff bears the burden of proving, by a

preponderance of the evidence, all of these statutory elements.  *Hopkins v. Crystal*

*2G Ranch, Inc. (In re Crystal)*, 513 B.R. 413, 418 (Bankr. D. Idaho 2014).

---

[77]  The precise total is $28,380,258.54.

[78]  The precise difference is $2,900,258.54.

MEMORANDUM OF DECISION - 37

While this provision is limited to transfers within 2 years of the petition date, § 544(b) allows a trustee to avoid any transfer of a debtor's property that occurred earlier if it would be avoidable under applicable law. *Barclay v. Mackenzie (In re AFI Holding, Inc.)*, 525 F.3d 700, 703 (9th Cir. 2008) (citing *In re Acequia, Inc.*, 34 F.3d 800, 809 (9th Cir. 1994)).[79] Here, the applicable state law is found in Idaho Code § 55-906, and the Uniform Voidable Transactions Act, Idaho Code §§ 55-910, *et seq.*, including Idaho Code § 55-913(1)(a) (transfers with actual intent to hinder, delay or defraud any creditor). Use of § 544(b) allows an extended look-back period allowing avoidance of such transfers that were made within four years prior to the bankruptcy filing. *See* Idaho Code § 55-918(1) (providing that causes of action under Idaho Code § 55-913(1)(a) are extinguished unless action is brought within 4 years); *see generally Decker v. Trammel (In re JTS Corp.)*, 617 F.3d 1102, 1111 (9th Cir. 2010) (discussing genesis and operation of §§ 544(b) and 548); *see also DBSI*, 869 F.3d at 1008.[80]

Plaintiff's Counts 1, 3 and 6 seek avoidance of transfers on the basis of

---

[79]  *Zazzali v. United States (In re DBSI, Inc.)*, 869 F.3d 1004 (9th Cir. 2017), states: "Section 544(b)(1), in relevant part, provides that a 'trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim . . . .' By its terms, Section 544(b)(1) requires the existence of an actual creditor who could avoid the transfer. 5 *Collier on Bankruptcy* ¶ 544.01. In other words, the effect of this section is 'to clothe the trustee with no new or additional right in the premises over that possessed by a creditor, but simply puts him in the shoes of the latter.' *Id.* ¶ 550.06[3][.]" *Id.* at 1009 (emphasis and some citations omitted). This requirement is amply met here given evidence establishing the existence of numerous unsecured creditors of DBSI, DBSI 2006 Notes, and DBSI 2006 LOF as of the petition date.

[80]  This Court also recently analyzed the application of "applicable law" under § 544(b). *See Hillen v. City of Many Trees, LLC (In re CVAH, Inc.)*, 570 B.R. 816 (Bankr. D. Idaho 2017).

MEMORANDUM OF DECISION - 38

"actual fraud." Under Count 1, Plaintiff relies on § 548(a)(1)(A) in regard to the Closing Transfer on February 26, 2007, as such date is within the two year period.[81] Under Count 3 and Count 6, Plaintiff relies on § 544(b) and the incorporated Idaho statutes to avoid the Earnest Money Transfer on October 10, 2006, a date within the four years preceding the petition date. Under each of these counts, Plaintiff seeks to impose liability on Defendant under § 550 and preservation of the avoided transfer for the benefit of the estate under § 551.[82]

### C. There was a single transaction

Defendant, emphasizing Plaintiff's terms "Earnest Money Transfer" and "Closing Transfer," contends that each was a separate transaction. As just one example, Defendant's closing argument states:

> In any event, the October earnest money deposit was not part of the contract that closed in February of 2007. The balance of the earnest

---

[81] The two year period runs from November 10, 2006, to the petition date of November 10, 2008.

[82] Section 548(a)(1)(B) permits avoidance of a transfer, made or incurred within 2 years prior to the petition date, that is "constructively fraudulent" on the basis that the transfer was made in exchange for less than reasonably equivalent value, and made when the transferor was insolvent; engaged in a business for which it had unreasonably small capital; or intended to incur debts beyond its ability to pay. Section 544(b)'s incorporation of state law includes similar provisions for avoidance of constructively fraudulent transfers, and Idaho Code § 55-913(1)(b) provides a four-year look back period. Count 2 (as to the Closing Transfer), and Counts 4 and 5 (as to the Earnest Money Transfer) plead such causes of action. Like the actual fraud counts, these constructive fraud claims seek to impose liability on Defendant under § 550 and to preserve the avoided transfer under § 551. The Court concludes, for the reasons that follow, that this litigation can be completely addressed under the "actual fraud" theory, and there is no need to address in detail the constructive fraud allegations. The Court also determines that it is unnecessary to reach the alternative theory of "unjust enrichment" in Count 7.

MEMORANDUM OF DECISION - 39

> money deposit of $3 million[83] was part of the original contract that was signed in April of 2006. That agreement was breached in November of 2006 and repudiated. When it was repudiated, both Goldsmith and Kastera deemed the earnest money forfeited. The parties negotiated further and entered into a new deal for the conveyance of the land in question, that was signed in February of 2007, just prior to closing. The new deal had no conditions, no post-closing obligations, conveyed the land as is and where is, made no reference to the earlier payments made on the April contract, and contained mutual releases among all parties.

Doc. No. 353 at 28. Defendant thus argues that the $25,400,000 closing amount was $80,000 less than the Court's $25,480,000 value found in Phase I and, consequently, that specific "transfer" could not be avoidable as either an actual or a constructively fraudulent transfer. *Id.* at 27–29.

Defendant's characterizations of the PSA as "repudiated" and the earnest money as "forfeited" and the ultimate conveyance as a "new deal" are not supported by the record. The evidence establishes the PSA was serially amended and, as so amended, was ultimately closed. Contrary to Defendant's explication, the obligation to pay the earnest money was reaffirmed through the "second amendment" even though the timing of its payment was changed by reason of the $500,000 extension payment, and the closing date and amount were changed through the third amendment.

Defendant's taxonomic arguments are found unpersuasive. The evidence establishes that both the Earnest Money Transfer and the Closing Transfer were

---

[83] The amount was, as noted, $2,980,258.54. Defendant's arguments, like Plaintiff's, tend to round that amount to $3,000,000.

MEMORANDUM OF DECISION - 40

components of a single transaction in which DBSI–originated funds were used to purchase the Tanana Valley Property.

The earnest money requirement and the closing obligation both arose out of the same contract, the PSA, and both payments were required in order to obtain the Tanana Valley Property.  Contrary to Defendant's contention that the agreement to pay $25.4 million was a "new deal" or a "new contract," the parties negotiated and executed a "*Third Amendment to* Real Estate Purchase and Sale Agreement" with direct internal reference to the original PSA of April 17, 2006 (therein defined as the "Agreement"), as amended previously by an addendum on April 17, 2006 and by the "Second Amendment" on September 13, 2006.  Ex. 511 at 1 (emphasis added).  In addition, Defendant's arguments about repudiation do not address the inclusion in the Third Amendment of paragraph 8, entitled "Continued Effectiveness of Terms of Agreement," which provides that "Except as provided in this Third Amendment, the terms and conditions of the Agreement [*i.e.*, the PSA] shall remain in full force and effect."  *Id.*  This Third Amendment to the PSA changed the closing date and the balance of the purchase price required of Plaintiff.

The closing statement corroborates the existence of a single transaction by providing Defendant a credit against the total purchase price for the earnest money that was paid prior to closing.  It was at all times the same basic contract for the sale of the real estate, though serially amended and completed in two stages.

MEMORANDUM OF DECISION - 41

While, as will be discussed, there were two transfers to Defendant at issue, they were not independent transactions as Defendant argues.

### D. The transfers were made by participants in, and in furtherance of, a Ponzi scheme

As noted at the outset of this Decision, Defendant does not now dispute the existence of a massive Ponzi scheme by DBSI and numerous related and consolidated entities. Plaintiff established at trial, particularly through the testimony of Miller, Bringhurst and McKinlay and the exhibits related to their testimony, that DBSI *et al*, under the control of Swenson, his sons, Ellison and others, was engaged in an enormous Ponzi scheme for an extended period of time. That time period encompassed all the dates relevant to this litigation. The fact that a Ponzi scheme existed is incontrovertible on the evidence presented at trial.

### 1. Kastera

The evidence establishes that Kastera was not independent of DBSI's control in connection with any of the matters here litigated. Even though Reeve wanted Kastera to independently operate, he held only a minority ownership position in the entity.[84] Swenson had a controlling two-thirds' interest in Kastera, and exercised that control, including at times dictating the work Kastera could perform, such as overruling Reeve's desire and recommendation that Kastera sell acquired properties for profit. Additionally, Kastera had no independent financial

---

[84] Indeed, even that interest was based on a "loan" from Swenson to Reeve, secured by Reeve's minority ownership in Kastera, that he felt he had no alternative but to accept.

MEMORANDUM OF DECISION - 42

ability to acquire property such as the Tanana Valley Property, and had to rely on loans from DBSI or DBSI entities. Whether funds would be made available to Kastera for use in its building or development efforts depended on the outcome of the cash management meetings and Swenson's ultimate controlling decisions at such meetings as to where funds would go. Kastera was also reorganized into two divisions, a structure that Morris as its general counsel did not understand, but which Kastera accepted because Swenson had so decided. Additionally, the acquisition of the Tanana Valley Property was made at a time when additional TIC property was desperately needed by DBSI. DBSI dictated that the transaction would close with the Property being vested in DBSI-TV, not Kastera, and after it was transferred to DBSI-TV, it was quickly put to use as TIC inventory.

Though neither a debtor nor a consolidated nondebtor in the bankruptcy, the evidence establishes Kastera was part and parcel of the DBSI operation, and the DBSI Ponzi scheme. The acquisition of the Tanana Valley Property would not have occurred but for DBSI's desire that it occur, and its control of the process and financing of the transaction. Kastera, among others, was utilized by DBSI to perpetuate the Ponzi scheme and the Tanana Valley Property acquisition was in furtherance of that scheme.

### 2. DBSI 2006 Notes and DBSI 2006 LOF

DBSI 2006 Notes and DBSI 2006 LOF were jointly administered debtors under the confirmed plan. *See* Ex. 315 (confirmation order) Ex. B (copy of

MEMORANDUM OF DECISION - 43

Second Amended Joint Chapter 11 Plan), p. 96 (defining DBSI 2006 Notes and DBSI 2006 LOF), p. 109 (defining Plan Debtors as including DBSI 2006 Notes and DBSI 2006 LOF), pp. 120–21 (summary of classification and treatment of claims against DBSI 2006 Notes), pp. 128–29 (same re: DBSI 2006 LOF)).

The financing structure used in facilitating the payment of the earnest money and the closing of the PSA transaction was orchestrated within the DBSI control group. DBSI 2006 LOF funded the earnest money transfer, and DBSI 2006 Notes funded the closing.

### 3.    DBSI Tanana Valley LLC

DBSI-TV was created to take title to the Property. It was an entity controlled by DBSI Housing Inc, Ex. 190, but it was not a DBSI Consolidated Debtor, a Consolidated Non-Debtor, or a Note/Fund Consolidated Debtor. *See* Ex. 315. After it took possession and title to the Property, the TIC process soon commenced with the first of the Cavanaugh PPMs issued 6 months later.[85] Though this implementation of the TIC was subsequent in time to the actual transfers at issue, its occurrence and timing supports and validates the finding that the Property's acquisition and use was designed to further the Ponzi scheme.

---

[85] Ex. 400. This PPM dated September 26, 2007 indicated that DBSI Cavanaugh LLC, a newly formed company, wholly-owned and managed by DBSI Housing Inc., was formed to acquire and sell TIC interests in a leasehold interest the company acquired in 8.02 acres of the overall property. DBSI-TV is identified as the "ground lessor" of that parcel.

MEMORANDUM OF DECISION - 44

E.    **Actual intent under § 548(a)(1)(A) and under § 544(b) and Idaho statutes**

1.    **The Ponzi presumption**

The district court in *Zazzali v. Eide Bailly LLP*, Case No. 12-CV-349-MJP, noted that "the existence of a Ponzi scheme is a matter of disputed fact for the jury; meanwhile the application of the Ponzi presumption is a matter of law that follows on the factual finding of a Ponzi scheme."[86]

A Ponzi scheme is made up of a series of fraudulent transfers. "The fraud consists of funneling proceeds received from new investors to previous investors in the guise of profits from the alleged business venture, thereby cultivating an illusion that a legitimate profit-making business opportunity exists and inducing further investment." *Donell v. Kowell*, 533 F.3d 762, 767 n.2 (9th Cir. 2008) (quoting *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 590 n.1 (9th Cir. 1991)); *Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1219 n.8 (9th Cir. 1988).[87]

---

[86]  Quoted in *Zazzali v. Goldsmith*, 2018 WL 626167, *3 (Bankr. D. Idaho Jan. 30, 2018).

[87]  A Ponzi scheme includes arrangements where later funds are used to pay off previous investors, even if not insolvent from its inception. In *Auza v. United Development, Inc. (In re United Devel., Inc.)*, 2007 WL 7541011 (9th Cir. BAP Aug. 7, 2007), the debtor ("UDI") was in the business of land development and financed its operations primarily through syndication fees from limited partnerships established when real estate in Mesa, Arizona was purchased. When the market had a downturn, the limited partnerships were not able to adequately fund their operations, including loan payments to the plaintiffs. UDI borrowed funds from existing and new investors in order to repay previous loans, and the cycle of borrowing from one set of investors to pay previous investors caused debtor's liabilities to become unsustainable. Auza, the defendant in a fraudulent transfer action, argued that UDI was not a Ponzi scheme because it was not insolvent from its inception. The BAP disagreed, and affirmed the bankruptcy court's conclusion
(continued...)

MEMORANDUM OF DECISION - 45

Since the evidence established the existence of a Ponzi scheme, the application of the presumption, as the district court above noted, is a matter of law.

As held in *Hayes v. Palm Seedlings Partners-A (In re Agric. Research and Tech. Group, Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990) ("*Agritech*"), "the mere existence of a Ponzi scheme" is sufficient to establish the actual intent to hinder, delay or defraud creditors under a state's fraudulent transfer statute. *See also AFI Holding*, 525 F.3d at 704 (same; citing *Agritech*). *See also Plotkin v. Pomona Valley Imports (In re Cohen)*, 199 B.R. 709, 717 (9th Cir. BAP 1996) (proof of a Ponzi scheme is sufficient to establish the operator's actual intent to hinder, delay, or defraud creditors for purposes of analyzing fraudulent transfers under both the Bankruptcy Code and the Uniform Fraudulent Transfers Act).[88]

In a DBSI-related adversary proceeding, the Delaware Bankruptcy Court explained:

> This Court has previously recognized and applied the [Ponzi] presumption in these DBSI cases. *See*, *e.g.*, *Zazzali v. 1031 Exch. Grp. (In re DBSI Inc.)*, __ B.R. __, Adv. No. 10-54648(PJW), 2012 WL 3306995 (Bankr. D. Del. Aug. 14, 2012); *Zazzali v. Swenson (In re DBSI Inc.)*, Adv. No. 10-54649(PJW), 2011 WL 1810632, at *4 (Bankr. D. Del. May 5, 2011).
>
> Yet the presumption does not relieve Trustee of the burden to

---

[87] (...continued)
"that UDI was both a Ponzi scheme and insolvent at all times material to this dispute." *Id.* at *4–5 (citing *Jobin v. McKay (In re M & L Bus. Machs. Co.)*, 155 B.R. 531, 535 n.7 (Bankr. D. Colo. 1993)).

[88]   Several of these authorities and others were noted in the Court's earlier decision. *See* 2018 WL 626167, *3 n.3.

MEMORANDUM OF DECISION - 46

show that the Transfers at issue were made "in furtherance of" the Ponzi scheme. *See, e.g., Bear Sterns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007) (noting that the court must determine "whether the transfers at issue were related to a Ponzi scheme" before it can apply the Ponzi presumption); *In re Pearlman*, 440 B.R. 569, 575 (Bankr. M.D. Fla. 2010) ("To rely on the Ponzi scheme presumption, the trustee must allege the debtors' loan repayments were somehow in furtherance of either the EISA Program or the TCTS Stock Program Ponzi schemes.") This is because even where a plaintiff has alleged the existence of a broad, fraudulent scheme, "the [c]ourt must focus precisely on the specific transaction or transfer sought to be avoided in order to determine whether that transaction falls within the statutory parameters of [an actually fraudulent transfer]." *Bayou Superfund, LLC v. WAM Long/Short Fund II, LP (In re Bayou Grp., LLC)*, 362 B.R. 624, 638 (Bankr. S.D.N.Y. 2007). *See also Manhattan Inv. Fund*, 397 B.R. at 11 (noting that "[c]ertain transfers may be so unrelated to a Ponzi scheme that the presumption should not apply").

*Zazzali v. AFA Fin'l Grp., LLC,* 2012 WL 4903593, *7 (Bankr. D. Del. Aug. 28, 2012).

### 2.    The involvement of DBSI entities

Defendant emphasizes that Kastera was neither a DBSI consolidated debtor nor a consolidated non-debtor. While that is true, it disregards the weight and import of the evidence. Kastera was controlled by Doug Swenson. Kastera's vision of developing the Tanana Valley Property was subordinated to the need of DBSI to use the Property for TIC investment. And, indeed, the Property was used in the Cavanaugh TIC solicitations within months of closing.

Kastera had no source of financing for this transaction other than DBSI. Reeve acknowledged Kastera could not use its banking sources for a loan of the

MEMORANDUM OF DECISION - 47

magnitude needed to acquire the Tanana Valley Property.  DBSI created DBSI-TV

to take title to the Property and was its sole owner.  The closing financing was

arranged through DBSI 2006 Notes.  Defendant's argument that "Kastera was a

separate entity and not in any way connected to the Ponzi schemes"[89] is belied by

the evidence.  So, too, is his assertion that "[t]he transaction itself clearly was not

in furtherance of any Ponzi scheme."[90]

Plaintiff established that the DBSI group of entities was insolvent, and

engaged in a Ponzi scheme at the time of the subject transfers to Defendant on the

earnest money note and the closing of the sale.  These transfers were orchestrated

by DBSI to further its Ponzi scheme.  DBSI 2006 Notes, DBSI 2006 LOF, Kastera

and DBSI-TV were all participants.

Kastera was the contract purchaser of the Tanana Valley Property under the

PSA and all the amendments to that PSA.  Defendant's closing brief asserts that

"[t]he money [paid to Defendant] came from Kastera, not an entity of the

bankruptcy estate."[91]  This is not fully accurate.  While the PSA was Kastera's

contract initially, and after several amendments that PSA finally closed, there are

other relevant factors established by the evidence.

---

[89]   Doc. No. 353 at 21.

[90]   *Id.*

[91]   *Id.*

MEMORANDUM OF DECISION - 48

(a)    The payment of the Earnest Money was made by and with funds transferred from DBSI 2006 LOF, to DBSI Housing, to Kastera, and then to Defendant.

(b)    The payment required at closing was made by and with funds transferred from DBSI 2006 Notes, to DRR, to Title One Corp., and then to Defendant.

(c)    Kastera was not independent, but instead was dominated and controlled by its 2/3 majority owner, Doug Swenson, in furtherance of DBSI's objectives and designs.

(d)    DBSI created DBSI-TV to, and it did, take title to the Property at closing.

(e)    The TIC solicitations for the Tanana Valley Property via the Cavanaugh PPMs commenced within months of closing.

Based on these facts, the transfers at issue were made in furtherance of the Ponzi scheme.  Under the case law and the application of the presumption, the Court concludes the transfers were done with actual intent to defraud.  Under § 548(a)(1)(A) and § 544(b) incorporating Idaho statutory law, they are avoidable as actually fraudulent transfers.

**F.    Liability for voidable transfers**

Section 550 provides:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from–

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

"The purpose of § 550(a) is 'to restore the [bankruptcy] estate to the financial condition it would have enjoyed if the transfer had not occurred.'" *USAA Fed. Sav. Bank v. Thacker (In re Taylor)*, 599 F.3d 880, 890 (9th Cir. 2010) (quoting *Aalfs v. Wirum (In re Straightline Invs. Inc.)*, 525 F.3d 870, 883 (9th Cir. 2008) (internal citations omitted)).

In pretrial litigation, the parties addressed issues regarding potential recovery. *See Zazzali v. Goldsmith*, 2013 WL 1498365 (Bankr. D. Idaho Apr. 13, 2013). For context, the Court there stated:

The parties address not only elements of the causes of action, but also the potential statutory rights of Trustee to recovery against initial and subsequent transferees. In the Ninth Circuit, "a transferee is one, who at a minimum, has dominion over the money or other asset, the right to put the money to one's own purposes." *Abele v. Modern Fin. Plans Servs., Inc. (In re Cohen)*, 300 F.3d 1097, 1102 (9th Cir. 2002) (citations omitted). The "dominion test" focuses on "whether an entity had legal authority over the money and the right to use the money however it wished." *Universal Serv. Admin. Co. v. Post-Confirmation Comm. (In re Incomnet, Inc.)*, 463 F.3d 1064, 1070 (9th Cir. 2006). This right is measured at the time the transfer is made, not at the time the trustee seeks to avoid the transfer. *See id*.

At this stage, Trustee has sufficiently alleged facts supporting maintenance of this action without joining [DBSI-TV]. First, Trustee

MEMORANDUM OF DECISION - 50

adequately alleged Kastera/[DBSI-TV] was a conduit for the [DBSI 2006] LOF funds in the Initial Transfer, and [DBSI-TV] and the escrow a conduit for the [DBSI 2006 Notes] funds paid Goldsmith in the Closing Transfer.  Second, even if Goldsmith's argument about Kastera/[DBSI-TV] being more than a mere conduit is ultimately provable, this does not mean Kastera/[DBSI-TV] need be joined before Trustee seeks relief from Goldsmith as a subsequent transferee: "[A] trustee is not required to avoid the initial transfer from the initial transferee before seeking recovery from subsequent transferees under § 550(a)(2)." *Woods v. Erickson, LLP v. Leonard (In re AVI, Inc.)*, 389 B.R. 721, 735 (9th Cir. BAP 2008).

*Id.* at *7.[92]

In addressing § 550 rights of recovery of avoided transfers, the Ninth

Circuit emphasized:

[The] distinction between initial and subsequent transferees is "critical." *Schafer v. Las Vegas Hilton Corp. (In re Video Depot, Ltd.)*, 127 F.3d 1195, 1197 (9th Cir. 1997).  Trustees have an absolute right of recovery against the "initial transferee" and any "entity for whose benefit such transfer was made."  *Danning v. Miller (In re Bullion Reserve of N. Am.)*, 922 F.2d 544, 547 (9th Cir. 1991).

*Henry v. Off'l Comm. of Unsecured Creditors of Walldesign, Inc. (In re Walldesign, Inc.)*, 872 F.3d 954, 962 (9th Cir. 2017).  In defining "initial transferee" for purposes of § 550(a), the Ninth Circuit in *Walldesign* reaffirmed its use of the "dominion test."  *Id.* at 962–63.  It stated:

---

[92]  In a footnote, the Court observed that the fact the "closing transfer" went through a title company was of no moment because, when an escrow company is used as an intermediary between two contracting parties, it is treated as the agent of both parties subject to the terms of that escrow agreement.  *Id.* at *7 n.19.  "Generally, the escrow agent merely acts as 'the conduit used in the transaction for convenience and safety,' and is disregarded."  *Id.* (citing *Foreman v. Todd*, 364 P.2d 365, 367 (Idaho 1961)).

> Under the dominion test, "a transferee is one who . . . has dominion over the money or other asset,"—in other words, one with "the right to put the money to one's own purposes." *In re Mortg. Store*, 773 F.3d at 995 (quoting *In re Incomnet*, 463 F.3d at 1070). The "key[s]" to this test are "'whether the recipient of funds has legal title to them' and whether the recipient has 'the ability to use [the funds] as he sees fit.'" *Id.* (quoting *In re Incomnet*, 463 F.3d at 1071). We further explained that, "an individual will have dominion over a transfer if, for example, he is 'free to invest the whole [amount] in lottery tickets or uranium stocks.'" *Id.* (quoting *Bonded Fin. Servs.* [*v. Eur. Am. Bank*], 838 F.2d [890,] 894 [(7th Cir. 1988)]). "The first party to establish dominion over the funds after they leave the transferor is the initial transferee; other transferees are subsequent transferees." *Id.* (citations omitted).

*Id.* at 963.

The "conduit" argument as signaled in the parties' pretrial litigation involved Plaintiff's contention that the earnest money transfer went from DBSI 2006 LOF to Kastera to Defendant, and that Kastera was a "mere conduit." 2015 WL 1498365 at *6. As to the closing transfer, Plaintiff contends DBSI 2006 Notes transferred the closing funds to DRR which, in turn, transferred them on behalf of DBSI-TV to TitleOne Corp as closing agent, who then paid them to or for the benefit of Defendant. *Id.*[93]

The decision in *Schoenmann v. BCCI Constr. Co. (In re Northpoint Communications Group, Inc.)*, 2007 WL 7541001 (9th Cir. BAP Nov. 7, 2007),

---

[93] As discussed earlier, a portion of the funds transferred at closing, which originated from DBSI 2006 Notes, did not go to Defendant or to his benefit, but were paid back to DBSI 2006 LOF to partially satisfy its advancing the amounts needed to fund the earnest money obligation.

MEMORANDUM OF DECISION - 52

provided a primer on the subject:

> The general rule is that the party who receives a transfer of property directly from the debtor is the initial transferee. *Incomnet*, 299 B.R. at 578. This applies to one-step transaction cases. *See Incomnet*, 299 B.R. at 580–81 (transfer was one-step transaction in which party determined to be "transferee" did not collect funds as agent for third party).

> However, in cases in which a two-step transaction exists (A transfers property to B as agent for C), the "conduit" rule, which is an equitable exception to the general rule, has emerged. Under this line of cases, courts have developed two standards to determine whether a party is an "initial transferee" or a "mere conduit": the "dominion test" and the "control test."

> Although courts have at times confused the terms, the Ninth Circuit and this Panel have consistently applied the dominion test where appropriate, and have declined to adopt the control test.

*Id.* at *3 (citations omitted).

### 1.    The earnest money transfer component

The Court concludes that in regard to the earnest money transfer—where funds went from DBSI 2006 LOF to Kastera and then to Defendant—Kastera had dominion over those funds and was thus the initial transferee. It is true that DBSI 2006 LOF provided the funds to Kastera for the purpose of paying Defendant the balance of the earnest money consistent with the amended PSA. However, the funds were deposited in Kastera's account. Thus Kastera had legal title to the earnest money funds. Indeed, while $3,000,000 was transferred into Kastera's account from DBSI 2006 LOF, Kastera only transferred $2,980,258.54 to

MEMORANDUM OF DECISION - 53

Defendant and retained the balance.  Once the $3,000,000 was in its account, Kastera had the ability to use the funds for a purpose other than the satisfaction of the promissory note and purchase of the Property (*e.g.*, buying lottery tickets or uranium stocks), even if such conduct would be, on this record, extremely unlikely.  Though Kastera was clearly controlled by DBSI and Swenson, the Ninth Circuit has rejected the control test, and the Court is compelled to conclude that Kastera had dominion over the earnest money funds.  It was thus the initial transferee.  Defendant was a subsequent ("immediate") transferee of this initial transferee.  *See* § 550(a)(2).

## 2.    The closing transfer component

In regard to the closing transfer, the funds originated with DBSI 2006 Notes.  Those funds went through DRR as a wiring intermediary, then through Title One as closing agent, and ultimately most of those funds were distributed to Defendant or to others for his benefit.  The Court finds and concludes that both DRR and Title One were conduits, lacking dominion over these transferred funds.

Kastera was not involved in this chain of transfer.  By closing, Kastera's interests under the PSA had been assigned to DBSI-TV.  And it was DBSI-TV that signed the statement of settlement approving the allocation of the closing funds.  *See* Ex. 155.  The evidence established that DBSI 2006 Notes directed payment of the funds to the title company on DBSI-TV's behalf based on the loan,

MEMORANDUM OF DECISION - 54

promissory note and mortgage involving the Property.  It is also clear that DBSI-TV closed the transaction and approved the closing agent's distribution of the funds, including $25,400,000 to or for the benefit of Defendant and $953,510.58 to DBSI 2006 LOF.  The relevant question is whether DBSI-TV is an initial transferee.[94]

In *Mano–Y & M, Ltd., v. Field (In re Mortgage Store, Inc.)*, 773 F.3d 990 (9th Cir. 2014), the Ninth Circuit addressed whether a former principal of a debtor, who still maintained control of the debtor, would be an initial transferee when he controlled and instructed a closing agent in the distribution of funds coming from the debtor for his benefit.  In applying a pure dominion analysis, the Circuit concluded that the party controlling the escrow agent was not the initial transferee as it lacked legal title to the funds at issue and the ability to use those funds as it saw fit.  The equitable interest of such a party in the debtor–originated funds in the hands of an agent was "too constrained to satisfy the dominion test." *Id.* at 997.  In other words, an agent's receipt and distribution of funds on behalf of a party is not sufficient by itself to give that party dominion over the funds.  The Circuit concluded those that received the funds at closing were the first to hold dominion over the funds and were thus the initial transferees.  In so holding, the

---

[94]  Like Kastera, DBSI-TV was part of the Ponzi scheme; it was controlled by DBSI and Swenson.  It was not, however, a debtor or consolidated non-debtor.  *See supra* note 59 and related discussion at page 44.

MEMORANDUM OF DECISION - 55

Circuit expressly abrogated *McCarty v. Richard James Enters. (In re*
*Presidential)*, 180 B.R. 233 (9th Cir. BAP 1995), in which the Bankruptcy
Appellate Panel was faced with a similar escrow situation and found the party
controlling the distribution of the funds through an escrow agent to be the initial
transferee despite not having direct control over the money.  The Circuit
concluded that "had the BAP in *Presidential* applied the pure dominion test . . . it
would have been compelled to deem [one of the parties receiving funds at closing,
there a realtor with a commission due under the contract] the initial transferee."[95]

Here, the Court concludes DBSI-TV lacked dominion over the closing
funds.  It never received or held legal title to the funds used to purchase the
Property from Defendant, and it did not have the ability to freely appropriate those
funds as they were committed to the closing agent to complete the amended PSA.
At that closing, Defendant received a portion of these funds directly and a portion
were paid to others on Defendant's behalf.  Based on Ninth Circuit precedent, the
Court concludes Defendant was the first to exercise dominion over those funds
and was thus the initial transferee in the closing transfer component.  *See*
§ 550(a)(1).

---

[95] Both *Presidential* and *The Mortgage Store* analyzed whether the principal (or former
principal) of the debtor, as the party directing the agent, would be deemed to have dominion over
funds in escrow and thus be the initial transferee.  Here, DBSI-TV was controlled by DBSI; it
was not the principal of DBSI.  But, like the principals in those cases, DBSI-TV is a non-debtor
entity directing a closing agent.  The status of the controlling party (*i.e.*, principal or non-
principal) should not alter the analysis assuming the lack of legal title and access to the funds and
the inability to use the funds as it sees fit are the same.

MEMORANDUM OF DECISION - 56

**G.    Limitation on a trustee's rights of recovery**

Section 548(c) provides:

Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, *a transferee* or obligee *of such a transfer* or obligation *that takes for value and in good faith* has a lien on or *may retain any interest transferred* or may enforce any obligation incurred, as the case may be, *to the extent that such transferee* or obligee *gave value to the debtor in exchange for such transfer* or obligation.

*Id.* (emphasis added).  As stated in *Cohen*:

There remains the question of the effect of the avoidance of the [ ] transfers that occurred . . . before bankruptcy, which are avoidable under Bankruptcy Code § 548 as actually fraudulent transfers made in furtherance of a Ponzi scheme.

The liabilities of transferees of avoided transfers are specified at Bankruptcy Code § 550.  Although the general rule is that transferees are liable either to return the property or pay its value, there are several safe harbors.

In addition, the Bankruptcy Code insulates the transferees of an avoided transfer who take for value and in good faith by providing that such a transferee has a lien, or may retain the interest transferred, to the extent the transferee gave "value to the debtor" in exchange for the transfer.  11 U.S.C. § 548(c).

199 B.R. at 719.

Under this provision, there are two requisites: value given by the transferee, and the good faith of the transferee.

As to subsequent transferees under § 550(a)(2), § 550(b) provides the following protections from recovery:

MEMORANDUM OF DECISION - 57

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

Thus, if a subsequent transferee takes for value and in good faith and without knowledge of the voidability of the transfer (or under § 550(b)(2) takes in good faith from a § 550(b)(1) subsequent transferee who took for value and in good faith without knowledge) then that subsequent transferee is protected from judgment.

## 1.      Good faith

### a.      Standards

Good faith, an "essential concept" of § 548(c), "is a notoriously hard-to-define concept in commercial law."  5 Collier on Bankruptcy ¶ 548.09[2][b], p. 548-102.2 (Richard Levin & Henry J. Sommer, eds., 16th ed).  In *Agritech*, the Court indicated that the issue of good faith involved what the transferee "knew or should have known" in an objective rather than subjective sense, and concluded that, if the circumstances would have put a reasonable person on inquiry of the debtor's fraud and a diligent inquiry would have discovered the same, good faith is lacking.  916 F.2d at 535–36.  *See also Heller Ehrman, LLP v. Jones Day (In re*

MEMORANDUM OF DECISION - 58

*Heller Ehrman LLP)*, 2013 WL 951706, *15 (Bankr. N.D. Cal. Mar. 11, 2013),

*disapproved on other grounds*, 527 B.R. 24 (N.D. Cal. 2014 (addressing

§ 550(b)(1) and citing *Agritech*)).[96]

The court in *Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367

B.R. 207 (Bankr. D. Nev. 2007), agreed.  It, like *Agritech*, quoted *Shauer v.*

*Alterton*, 151 U.S. 607, 621 (1894), regarding a lack of good faith:

> [W]hile the plaintiff was not bound to act upon mere suspicion as to the
> intent with which [the transferor] made the sale in question, if he had
> knowledge or actual notice of circumstances sufficient to put him, as
> a prudent man, upon inquiry as to whether [the transferor] intended to
> delay or defraud his creditors, and he omitted to make such inquiry
> with reasonable diligence, he should have been deemed to have notice
> of such fact, and therefore such notice as would invalidate the sale to
> him, if such sale was in fact made with the intent upon the part of the
> [transferor] to delay or defraud other creditors.

367 B.R. at 223–24.

In the corollary area of good faith and knowledge as elements under

§ 550(b), this Court stated in *Hopkins v. D.L. Evans Bank (In re Fox Bean Co.,*

*Inc.)*, 287 B.R. 270 (Bankr. D. Idaho 2002), that "[I]f a transferee has knowledge

of facts that would indicate a particular transfer may be subject to avoidance by a

bankruptcy trustee, and if further inquiry would reveal that the transfer is in fact

recoverable, the transferee cannot 'sit on his hands, thereby preventing a finding

that he has knowledge.'" *Id.* at 283 (citing *Genova v. Gottlieb (In re Orange*

---

[96]  *See also* Collier, *supra* at ¶ 548.09[2][b], p. 458-102.2–102.3 (discussing *Agritech*).

*County Sanitation, Inc.)*, 221 B.R. 323, 328–29 (Bankr. S.D.N.Y. 1997) (internal

citation omitted)).

### b.    Application

It is beyond argument that Defendant knew that Kastera was owned and

managed by Doug Swenson and Reeve; that Swenson "had some money;" that

Swenson's willingness to sign as a guarantor of payment of the earnest money was

material; that Kastera would get the resources necessary for it to perform and

consummate the transaction through DBSI; and that such funding was dependent

on the successful issuance of a bond.  Defendant also knew, by the time of closing,

that Kastera's interests in the PSA had been assigned to a DBSI entity, DBSI-TV,

and that DBSI-TV was acquiring a loan from DBSI 2006 Notes in order to finance

and close the transaction.

However, the evidence did not establish that Defendant knew, at the time of

the transaction, that DBSI and the DBSI-related entities were involved in a

massive Ponzi scheme dependent on continually acquiring property in order to add

TIC inventory and soliciting new investors in order to pay old investors.

Plaintiff contends there were sufficient red flags to alert Defendant and put

him "on inquiry notice."  Plaintiff argues that, using the appropriate objective

standard, Defendant was required to exercise further caution and diligence.  *See*,

*e.g.*, Doc. No. 308 at 36.  Plaintiff emphasizes, for example, the inability of

MEMORANDUM OF DECISION - 60

Kastera to timely satisfy the earnest money payment.  But Plaintiff downplays the

fact that an extension was granted in return for a $500,000 payment, that the

extension was short, and that the earnest money obligation was later satisfied as

agreed.  Plaintiff similarly notes the closing date was extended because "the bond

was out" but does not acknowledge that use of a "bond" or other financing

mechanism could be viewed simply as a necessary means for a large and

sophisticated enterprise to generate a substantial amount required for closing.

Doc. No. 308 at 36.[97]

As Collier notes: "the presence of any circumstance placing the transferee

on inquiry as to the financial condition of the transferor may be a contributing

factor in depriving the former of any claim to good faith unless investigation

actually disclosed no reason to suspect financial embarrassment."  Collier,

¶ 548.09[2] at p. 548-102.3 (citations omitted).  The Court has itemized and

described in this Decision the facts known to Defendant at the time of the

transfers.  They do not establish a lack of good faith, nor do they support the idea

that additional inquiry by Defendant and/or his counsel was required in order to

---

[97]   Plaintiff also argues that the "risks to FOR 1031's TIC syndication model" is a factor
related to objectively reasonable notice or inquiry.  *Id.*  This appears to be a reference to the
parties' discussions as shown in Defendant's memo, Ex. 204.  *See supra* note 67.  The Court finds
the evidence of what exact information was provided to Defendant, and specifically information
of the "risks" to FOR 1031's TIC solicitations, does not adequately support Plaintiff's "inquiry"
contentions.  The manner in which the information was delivered and explained would be critical
to finding Defendant was aware of the TIC processes to a degree that he was placed on notice of
potential Ponzi aspects or similar grounds for inquiry.  The testimony regarding this meeting does
not meet that burden.

MEMORANDUM OF DECISION - 61

establish good faith.

The existence of the Ponzi scheme, and the role the acquisition of the Tanana Valley Property had in its perpetuation, are clear in retrospect.  As noted at the outset of this Decision, Defendant now acknowledges it.  But that is not the critical date under § 548(c) or § 550(b) for evaluating Defendant's knowledge and good faith.

The Court concludes the weight of the credible evidence establishes Defendant acted in good faith.  Thus Defendant is entitled to the protection of § 548(c) as the initial transferee to the extent he gave value to the debtor at closing.  And Defendant is entitled to the protection of § 550(b)(1) as a subsequent transferee if value was provided in the earnest money transfer.

### 2.    Value

#### a.    Standards

Under § 548(c), a transferee may retain any interest transferred "to the extent that such transferee . . . gave value to the debtor in exchange for such transfer[.]"  Value means, inter alia, "property."  Section § 548(d)(2)(A).  And value is determined as of the time the transfer occurred.  *Gladstone v. Schaefer (In re UC Lofts on 4th, LLC)*, 2015 WL 5209252, *16–17 (9th Cir. BAP Sep. 4, 2015) (citing *BFP Resolution Trust Corp.*, 511 U.S. 531, 546 (1994)).

However, unlike § 548(c) which protects the good faith initial transferee *to*

*the extent* value is given to the debtor, a subsequent good faith transferee utilizing the § 550(b)(1) defense must merely provide value to be fully protected from recovery. *See* Collier, ¶ 550.03[1] at 550-25 ("The 'value' required to be paid by the secondary transferee is merely consideration sufficient to support a simple contract . . . . The term 'value' in this subsection is different from and does not mean value to the debtor"); *see also Bonded Fin. Servs.*, 838 F.2d at 897; *In re Johnson*, 357 B.R. 136, 141–42 (Bankr. N.D. Cal. 2006).

Here, Defendant was both a subsequent transferee, receiving the earnest money funds from an initial transferee (Kastera), and an initial transferee, receiving the closing funds from DBSI 2006 Notes. Thus there is some merit to Defendant's contentions that these transfers should be analyzed separately. But there are limits to that proposition, because these transfers here formed a single transaction resulting in the sale and conveyance of the Property.

As the Ninth Circuit has recognized, "Bankruptcy courts are courts of equity. As such, they possess the power to delve behind the form of transactions and relationships to determine the substance." *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 596 (9th Cir. 1991) (citing *Global W. Dev. Corp. v. Northern Orange County Credit Serv., Inc. (In re Global W. Dev. Corp.)*, 759 F.2d 724, 727 (9th Cir. 1985) (other citations omitted)). Relying on this holding in *United Energy*, the court in *Uecker v. Ng (In re Mortgage Fund '08*

MEMORANDUM OF DECISION - 63

*LLC)*, 2013 WL 4475487 (Bankr. N.D. Cal. Aug. 14, 2013), stated: "To that end, a segmented transaction may be viewed as one deal and the parties' labels may not be controlling as to the rights of the parties." *Id.* at *5 (citing *Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.)*, 174 B.R. 557, 584 (Bankr. N.D. Cal. 1994)).[98]  As stated by the court in *Argyle Online, LLC v. Nielson (In re GGW Brands, LLC)*, 504 B.R. 577, 593 n.26 (Bankr. C.D. Cal. 2013), "[W]here a transfer is only a step in a general plan, the plan must be viewed as a whole. . . ." *Id.* (citing *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (citation and internal quotations omitted)).  "[A] court should consider the overall financial consequences these transactions have on the creditors." *Id.* (citing *Mervyn's LLC v. Lubert-Adler Group IV, LLC (In re Mervyn's Holdings, LLC)*, 426 B.R. 488, 497 (Bankr. D. Del. 2010)).

### b.    Application

### i.    Earnest money

In the earnest money transfer, in exchange for the funds received by Defendant, Kastera was able to move forward under the PSA to obtain the Property.  In addition, the earnest money funds satisfied Kastera's promissory note

---

[98]  In *Pajaro Dunes*, $1 million was transferred in six installments, and treated as one transfer.

obligation.[99]  This constitutes value to support a simple contract.  Under these

facts, Defendant provided such value in good faith in exchange for the earnest

money transfer and without knowledge of the avoidability of the transfer.  As a

"transfer" avoidable under § 544(b) and Idaho law, and recoverable from

Defendant—the subsequent transferee—under § 550(a)(2), Defendant is entitled to

the defense under § 550(b)(1).

### ii.    Closing

As Defendant was the initial transferee in the closing transfer under

§ 550(a)(1), Trustee may recover the value of the debtor's property transferred to

him under § 548.  However, § 548(c) provides Defendant protection "to the extent

[he] gave value to the debtor."  This analysis is distinguishable from the earlier

dominion test.  Value includes any benefit, direct or indirect, and a debtor may

receive value without holding legal title.  Here, Defendant provided and conveyed

the Property at closing.  While legal title to the Property was transferred to

DBSI-TV, a non-debtor entity, DBSI-TV was wholly owned and controlled by

DBSI, and the evidence establishes that the debtor received value.  DBSI 2006

Notes received a secured interest in the Property at the time of closing and DBSI

ultimately utilized the Property in its Ponzi scheme selling TIC interests in the

Property to TIC investors.  Thus the Court finds Defendant provided value to the

---

[99] And, incidentally, it satisfied the guarantees of Swenson and Reeve, though that
provided no direct value to Kastera.

MEMORANDUM OF DECISION - 65

debtor as required by § 548(c).

Defendant has argued that, in regard to the closing transfer, he received $25,400,000 which was less than the $25,480,000 value of the Property established in Phase I and provided at closing. The proposition, however, is myopic in its focus solely on the 2007 payment. The 2006 earnest money payment is not irrelevant.

First, the earnest money payment is part and parcel of the PSA by which Defendant sold the Property. The Court has already discounted the argument that the PSA was "breached" and, instead, has recognized that the PSA was serially amended and remained in full force and effect as amended.

Second, the case law allows the Court to evaluate the reality of the entire transaction, even though there were two separate in time payments constituting the total consideration paid for the Property. Here, the two transfers formed a single and unitary transaction.

The Court's conclusion above that there can be no § 550 recovery for the 2006 earnest money transfer is not something that can be viewed in total isolation. Nor can the receipt and retention of nearly $3,000,000 be deemed irrelevant to the closing. The closing could not and would not have occurred without the credit of that initial earnest money payment. This amount was in satisfaction of an initial payment required under the PSA as a condition of Defendant going forward with

MEMORANDUM OF DECISION - 66

the transaction. And if Kastera (or, as here, DBSI-TV as assignee of Kastera's rights) proceeded to close the sale under the PSA, the $3 million was by the PSA's terms treated as a credit toward the total price of $28,400,000.[100]

Fundamentally, the rejection of Plaintiff's avoidance action as to the earnest money payment means, looking at that transfer in isolation, Defendant can retain those funds. But the PSA remained in existence. It was a contract between the parties. If Kastera (or its assignee) failed to close, it would forfeit that earnest money so paid.[101] Conversely, if Defendant failed to perform his obligations under the contract and transfer the Property at closing, Kastera (or its assignee) was entitled, among other things, to refund of the earnest money payment.[102] In short, Defendant may keep the $3,000,000 but, ultimately, he had to, and did, apply it toward the total amount paid for the sale of the Property at the time of closing.[103]

---

[100]   Ex. 101 at 1, ¶ 1.3; Ex. 140 at 1, ¶ 3.

[101]   Ex. 101 at 5, ¶ 3.4.

[102]   Ex. 101 at 1, ¶ 1.3 (establishing purchase price payments consisting of earnest money note payment and balance payment) and at 5, ¶ 3.2 (noting that should Defendant fail to consummate the sale, Kastera would be "entitled to pursue any lawful right or remedy to which Buyer may be entitled, including, without limitation, the immediate refund to Buyer of all Earnest Money paid.").

[103]   Assume, for example, that the earnest money had been paid over 4 years prior to the date of the filing of the bankruptcy petition and no possibility existed for § 544(b)'s application. When the parties' PSA closed within 2 years of the petition date, Defendant conveyed real property worth $25,480,000 for a payment of $28,400,000 (consisting of a prior payment of $3,000,000 and a final payment of $25,400,000). The failure of Plaintiff's § 544(b) cause here
(continued...)

Using the precise figures, $2,980,258.54 (an earnest money payment originating with DBSI 2006 LOF) and $25,400,000 (closing funds obtained from DBSI 2006 Notes) were paid to Defendant in return for transfer of the Property. In exchange for this $28,380,258.54, Defendant provided value at closing to the debtor of $25,480,000 (the value of the Property). Pursuant to § 548(c), Defendant may retain the funds he received from the debtor to the extent of the value he provided in good faith. Thus, only $2,900,258.54 of the $28,380,258.54 remains voidable under § 548(a)(1) after application of § 548(c). Plaintiff is found to be entitled to a judgment under § 548 and § 550(a)(1) against Defendant, as the initial transferee of the closing transfer, in the amount of $2,900,258.54.

**CONCLUSION**

On the whole of the evidence, the Court concludes the transfers to Defendant were made with actual fraudulent intent and are avoidable. However Defendant acted in good faith and without knowledge of the Ponzi activities of DBSI, and he is entitled to the defenses provided under § 548(c) and § 550(b)(1) to the extent he provided appropriate value. Given the structure of the transfers and transaction, this results in a recovery of $2,900,258.54 from Defendant as the initial transferee of the closing transfer.

---

[103] (...continued)
yields the same result; Defendant kept the $3,000,000 and, ultimately, applied it toward the total value paid for the sale of the Property.

MEMORANDUM OF DECISION - 68

Plaintiff shall prepare and submit a proposed form of judgment.

DATED:  October 17, 2018

TERRY L. MYERS
CHIEF U. S. BANKRUPTCY JUDGE